Domingo P. QUIBAN, Plaintiff,

v.

UNITED STATES VETERANS
ADMINISTRATION,
Defendant.

Civ. A. No. 86–2155.

United States District Court,
District of Columbia.

May 12, 1989.

Bernice B. Weinsteinre, Office of General Counsel, Veterans Admin., Washington, D.C., for plaintiff.

Daniel Bensing, Asst. U.S. Atty., Washington, D.C., for defendant.

Kenneth S. Kaufman and Albert J. Beveridge, III, Beveridge & Diamond, Washington, D.C., for amicus curiae.

## MEMORANDUM AND ORDER

AUBREY E. ROBINSON, Jr., Chief Judge.

This suit has been brought by the wife of a deceased veteran of the Philippine Army who served in the American Armed Forces during World War II; it seeks veterans' survivors' benefits based on her husband's death. Currently pending is defendant's motion to dismiss for failure to state a claim upon which relief may be granted. The dispositive issue is whether 38 U.S.C. § 107(a), which limits the veterans' benefits available to veterans of the Philippine Army and their spouses, is constitutional. Because the Court concludes that § 107(a) is unconstitutional, defendant's motion will be denied; summary judgment will be entered for plaintiff.[1]

BACKGROUND:

a) *Procedural History:*

Plaintiff, as the widow of a deceased Philippine Army veteran who served with American forces during World War II pursuant to a military order issued by President Roosevelt, sought veterans' survivors' benefits from the Administrator of Veterans Affairs ("Administrator"). The Administrator, however, denied her application for benefits after concluding that her husband's death was not service-connected. The Administrator's action was mandated by 38 U.S.C. § 107(a), which limits the veterans' benefits available to Philippine Army veterans who served with the U.S. Army in World War II; their benefits are limited to enumerated service-connected death and disability benefits. 38 U.S.C. § 107(a).[2]

Plaintiff then brought suit in this Court. After granting plaintiff leave to proceed *in forma pauperis*, the Court *sua sponte* dismissed the complaint on jurisdictional grounds. The Court of Appeals for the District of Columbia Circuit, however, vacated the dismissal and remanded the case for consideration of the constitutionality of § 107(a)'s exclusion of Philippine Army veterans from veterans' benefits for non-service-connected disabilities. *Quiban v. Veterans Administration,* No. 86–5685 (D.C. Cir. September 22, 1987). *See generally Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (court may consider constitutional challenge to Act of Congress denying benefits to a certain class even though it may not consider challenge to the decision of the Administrator under a law providing benefits).

Following remand, the government moved to dismiss for failure to state a claim. The Court attempted to appoint Beveridge & Diamond as counsel, but they have been unable to obtain signed authorization from plaintiff. Therefore, they have briefed and argued the issue as *amicus curiae.*[3] Oral argument on defendant's motion was held on March 16, 1989.

b) *The Relationship Between the Philippines and the United States:*

The United States acquired the Philippine Islands as a result of the Spanish–American War of 1898.[4] In 1902 Congress established a civil government in the Philippines; the civil government's powers were restricted by a "bill of rights" analogous to our own.[5] The Philippines, however, were never, nor ever intended to be, incorporated into the United States; from acquisition to grant of independence the Philippines remained an unincorporated territory of the United States.

---

**1.** *See, e.g., Kennedy v. Whitehurst,* 509 F.Supp. 226, 232 (D.D.C.1981) (when controlling legal issues have been fully briefed and no genuine issues of material fact remain, court may enter summary judgment *sua sponte*), *aff'd,* 690 F.2d 951 (D.C.Cir.1982).

**2.** *See* note 15 *infra* (quoting statute).

**3.** The Court would like to take this opportunity to thank Beveridge & Diamond once again for their assistance. Their briefs have been uniformly excellent and their arguments persuasive.

**4.** *See* 1898 Treaty of Paris, 30 Stat. 1754.

**5.** Act of July 1, 1902, ch. 1369, § 5, 32 Stat. 691, 692–93; *see, e.g., Kepner v. United States,* 195 U.S. 100, 116–20, 24 S.Ct. 797, 799–801, 49 L.Ed. 114 (1904).

In 1916 Congress expressed its intention to grant the Philippines full independence at the proper time.[6] By enactment of the Philippine Independence Act in 1934, Congress declared that full independence would be granted within ten (10) years.[7] World War II intervened and delayed that plan, but full independence was granted on July 4, 1946.[8]

c) *The Relationship Between the Armed Forces of the United States and the Philippines Army:*

From the very beginning of United States control over the Philippines, the United States maintained a military presence there consisting of Filipino natives. By Act of February 2, 1901, ch. 192, § 36, 31 Stat. 748, 757, the President was authorized to enlist native Filipinos for service in the Army. The authorization was for twelve thousand men; these personnel were called Philippine Scouts, and are also referred to as Old Philippine Scouts. For sake of convenience, this opinion will refer to them as Old Philippine Scouts.

Old Philippine Scouts are considered veterans of the United States Armed Forces and are entitled to full veterans' benefits on the same basis as any other veteran. They are *not* subject to the limitations of § 107. During World War II, Old Philippine Scouts were not paid as much as other members of the United States Army;[9] when the Philippine Army was first called into service by President Roosevelt in 1941, Old Philippine Scouts were paid more than members of the Philippine Army, but the rates of pay were equalized during the war.[10]

In 1935, after passage of the Philippines Independence Act providing for eventual Philippine independence, formation of the Philippine Army was begun; it was to consist of Filipino natives, naturally, with the President of the Philippine Commonwealth as the Commander-in-Chief.[11]

On July 26, 1941, President Roosevelt issued a military order calling members of these forces into the service of the United States Army. The President's Order stated, in relevant part:

[A]s Commander-in-Chief of the Army and Navy of the United States, I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General Officer, United States Army, ... all of the organized military forces of the Government of the Commonwealth of the Philippines....

6 Fed.Reg. 3825 (July 26, 1941), *quoted in Second Supplemental Surplus Appropriation Rescission Bill, 1946: Hearings on H.R. 5604 Before the Subcommittee of the Senate Committee on Appropriations,* 79th Cong., 2d Sess. 56 (1946), *reprinted in Amicus Curiae's* SurReply Brief as Exhibit 1.

The President's authority to take such action was contained in the Philippines Independence Act of 1934, which specifically reserved to the United States the right "to call into the service of [the United States] armed forces all military forces organized

---

**6.** S.Rep. No. 494, 73rd Cong., 2d Sess. 5–6 (1934).

**7.** Philippine Independence Act, Pub.L. No. 73–127, § 10(a), 48 Stat. 456, 463 (1934).

**8.** *See, e.g., Filipino Am. Veterans & Dependents Ass'n v. United States,* 391 F.Supp. 1314, 1316 (N.D.Cal.1974); Proclamation No. 2695, 11 Fed. Reg. 7517 (1946), *reprinted in* 22 U.S.C. § 1394 note (1982).

**9.** This statement applies to the enlisted men of both units. Officers of the Old Philippine Scouts, who were predominately but not exclusively Americans, were paid the same as officers of the United States Army. *See* U.S. Army Center for Military History, *The Status of Members of Philippine Military Forces During World War II* 40 (June 1973) (hereafter Army Study), *reprinted in Amicus Curiae's* Opposition to Defendant's Motion to Dismiss as Exhibit 1; *Second Supplemental Surplus Appropriation Rescission Bill, 1946: Hearings on H.R. 5604 Before the Subcommittee of the Senate Committee on Appropriations,* 79th Cong., 2d Sess. 47 (1946) (hereafter Hearings), *reprinted in Amicus Curiae's* SurReply Brief as Exhibit 1.

**10.** Army Study, *supra* note 9, at 32–35; Hearings, *supra* note 9, at 47.

**11.** *See* Army Study, *supra* note 9, at 6.

by the Philippine government." [12] Following the President's Order, the United States assumed responsibility for pay and supplies for the Philippine Army, once the units were inducted into service. [13] It is specifically those Filipinos who were called into service pursuant to this Order who have their benefits limited by § 107(a).

As noted above, shortly after the Philippine Army was called into service of the United States the rates of pay for members of the Philippine Army were raised to the level of pay accorded to members of the Old Philippine Scouts. Although defendant contends that it was intended that the Philippine Army maintain its distinct, uniquely Philippine character, it concedes that after the Philippine Army was called into service of the United States Army de facto command and control were passed to United States Army personnel. Defendants' Motion to Dismiss at Appendix 3, *Quizon v. Veterans' Administration,* No. 87–2836 (D.D.C. motion filed Dec. 21, 1987). Moreover, by the Order's plain terms, command was passed to a "general officer, United States Army."

After hostilities ceased, Congress passed the Armed Forces Voluntary Recruitment Act of 1945. Section 14 of this Act authorized the Secretary of War, "with the approval of the Philippine Government," to raise a new contingent of "Philippine Scouts" for service throughout the Far East. Since these new recruits would become Philippine Scouts shortly before independence was to be granted to the Philippines, it was intended that these "New Philippine Scouts" would be a trained body of men whom the Philippine Government could incorporate into their own Army, which in fact occurred. Thus their veterans' benefits were limited as well, this time by § 107(b), a provision not implicated by Plaintiff's suit.

DISCUSSION:

 The intent and effect of section 107(a) is to limit the veterans' benefits available to members of the Philippine Army [14] who were called into service of the United States Army by President Roosevelt's July 26, 1941 Order, to certain enumerated service-connected disability and death benefits. [15] And for those benefits that are available, members of the Philippine Army are paid on a peso for dollar rate, instead of the dollar for dollar rate that all other veterans receive, including

12. Philippine Independence Act, Pub.L. No. 73–127, § 2(a)(12), 48 Stat. 456, 457 (1934).

13. Army Study, *supra* note 9, at 12. Induction of Philippine Army units into the United States Armed Forces in the Far East was somewhat gradual, but was completed by about December 8, 1941. *Id.*

14. As the statute makes clear, *see* note 15 *infra* (quoting statute), the limitation applies also to recognized guerilla units; these were composed of members of the various military units, including Old Philippine Scouts, Philippine Army, and United States Army, who were captured by but who escaped from the Japanese. General MacArthur and Philippine President Osmena "recognized" many of these guerilla units; in fact, MacArthur called into service of the U.S. Armed Forces most (if not all) of the "recognized" guerilla units, in accordance with the continuing authority of President Roosevelt's July 26, 1941 Order. *See* Army Study, *supra* note 9, at 56–57.

15. The statute provides:
(a) Service before July 1, 1946, in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941, including among such military forces organized guerilla forces under commanders appointed, designated, or subsequently recognized by the Commander in Chief, Southwest Pacific Area, or other competent authority in the Army of the United States, shall not be deemed to have been active military, naval, or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by the reason of the service of such person or the service of any other person in the Armed Forces, except benefits under—
(1) contracts of National Service Life Insurance entered into before February 18, 1946;
(2) chapter 10 of title 37; and
(3) chapters 11, 13 (except section 412(a)), and 23 of this title.
Payments under such chapters shall be made at a rate in pesos as is equivalent to $0.50 for each dollar authorized. . . .
38 U.S.C. § 107(a).

members of the Old Philippine Scouts.[16] This reduces the value of the benefits received by 50%.

Because the only veterans affected by § 107 are Filipinos, *amicus* contends that the classification made by the statute is one based on race, national origin or citizenship; accordingly, *amicus* contends it should be subject to the strict scrutiny normally given to statutory classifications based on race, national origin or citizenship. Defendant contends that strict scrutiny is not appropriate here for two reasons: First, defendant asserts, the Fifth Amendment's Due Process Clause does not apply to a congressional determination as to the appropriate level of benefits for Philippine veterans, because of Congress' "Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. article IV, § 3, cl. 2. Second, defendant asserts, the classification does not discriminate on basis of race, national origin or alienage; instead the classification is based on the *"time, terms, and conditions of service* with the American and Allied military forces in the Philippines during World War II." Defendant's Reply to Memorandum of *Amicus Curiae* at 11 (emphasis in original). Therefore, only the rational basis test should be applied.

■ Defendant's first argument—that the Territory Clause trumps the Due Process Clause—is without merit.[17] It is un-

disputed that Congress' power over unincorporated territories is not absolute and the Constitution imposes " 'fundamental limitations in favor of personal rights' *e.g.*, deprivation 'of life, liberty or property without due process of law' or 'principles which are the basis of all free government which cannot with impunity be transcended.' " *Filipino American Veterans & Dependents Association v. United States*, 391 F.Supp. 1314, 1321 (N.D.Cal.1974) (three judge panel) (hereafter *Filipino Veterans* ) (citing *Downes v. Bidwell*, 182 U.S. 244, 269, 280, 282, 292, 21 S.Ct. 770, 780, 784, 785, 789, 45 L.Ed. 1088 (1901); *Dorr v. United States*, 195 U.S. 138, 146, 147, 149, 24 S.Ct. 808, 811, 812, 813, 49 L.Ed. 128 (1903); *Balzac v. Porto Rico*, 258 U.S. 298, 312, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922)). Thus the issue is whether Congress' action transcends a fundamental limitation in favor of personal rights.

■ The Due Process Clause, by its very terms and historical function, is a "fundamental limitation [on governmental power] in favor of personal rights." It has been long-recognized and accepted that the Due Process Clause contains an equal protection component. *See Richardson v. Belcher*, 404 U.S. 78, 81, 92 S.Ct. 254, 257, 30 L.Ed.2d 231 (1971); *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954). Straight-forward application of these principles mandates the conclusion that the Due Process Clause limits Congress' power to make arbitrary and irrational classifica-

---

**16.** *Id.*

**17.** *But see Filipino Am. Veterans & Dependents Ass'n v. United States*, 391 F.Supp. 1314, 1321–22 (N.D.Cal.1974) (three judge panel). With all due respect, the *Filipino Veterans* court's analysis of whether the Due Process Clause applies misses the mark. The issue is not whether an individual has a "property right" to receive benefits. *See id.* at 1322 ("Since even United States citizens and residents have no constitutional or fundamental right, as such, to receive veterans' benefits at all, such a limited exclusion of Filipino veterans certainly does not involve fundamental personal rights or principles, affecting life, liberty or property . . ."). At best, that issue goes to the *merits* of the claim under the Due Process Clause, not to the *applicability* of the Due Process Clause as a limitation on Congress' power over individuals in Territories.

The issue is whether the equal protection component of the due process clause limits Congress' power to exclude otherwise similarly situated Filipino veterans from receiving benefits on an equal basis with other veterans. By framing the issue this way the Court does not presume to decide the issue of whether Philippine Army veterans are similarly situated with other veterans who receive full benefits. It merely poses the question whether Congress has the power to determine, arbitrarily, that similarly situated persons will not be treated similarly. If, of course, the affected veterans are not similarly situated, then the equal protection claim fails; proving that they are similarly situated with veterans who receive full veterans' benefits is a necessary part of plaintiff's case.

tions in benefit programs affecting residents of unincorporated Territories. That a governmental benefit is at issue does not alter this conclusion.

■ When persons similarly situated with others are denied benefits pursuant to an arbitrary and irrational classification, they have not received due process, regardless of whether their right to the benefit is considered a property right, a "fundamental" right, or not a right but a "benefit"; they have received arbitrary and irrational "process". The key right is not the right to benefits per se, it is the right to be treated on the same basis as others with whom a person is similarly situated.[18] This right is unique to the individual and basic to our form of government; it cannot be characterized as anything but a "fundamental limitation in favor of personal rights."

Every Supreme Court case to discuss the issue has indicated that the Due Process Clause, including its equal protection com-

ponent, limits Congress' power to legislate pursuant to the Territory Clause.[19] Indeed, the Supreme Court case most analogous to this case, because it concerned a Fifth Amendment equal protection attack on a congressional determination to limit benefits for residents of an unincorporated territory, implicitly recognizes this principle, because it held that Congress must have a rational basis when it treats a Territory differently from the States. *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980). In *Rosario*, plaintiffs had advanced a Fifth Amendment equal protection claim to challenge federal legislation providing for lower payments to Puerto Rico than to States in connection with the Aid to Families with Dependent Children program. 446 U.S. at 651, 100 S.Ct. at 1930. The Court, in a brief *per curiam* decision,[20] rejected the contention that strict scrutiny was appropriate, because of Congress' power under the Territory Clause; and it held that there was a

18. This basic principle is perhaps even more compelling here: the United States had the power, and exercised that power, to call plaintiff's spouse into the military and make life and death decisions affecting members of the Philippine Army; aside from enforcing the criminal law, this is probably a sovereign's ultimate power over an individual. Certainly plaintiff has the right to insist that the government have a rational basis for treating differently those over whom it exercises that power.

19. *See Torres v. Puerto Rico*, 442 U.S. 465, 469–70, 99 S.Ct. 2425, 2428–29, 61 L.Ed.2d 1 (1979) (Puerto Rico, an unincorporated territory like Philippines, subject to due process and equal protection guarantees); *Examining Board of Eng'rs. v. Flores de Otero*, 426 U.S. 572, 599–601, 96 S.Ct. 2264, 2280, 49 L.Ed.2d 65 (1976) (same); *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 n. 5, 94 S.Ct. 2080, 2084 n. 5, 40 L.Ed.2d 452 (1974) (same); *Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922) (fundamental personal rights such as due process have full application in Philippines); *Dorr v. United States*, 195 U.S. 138, 146–47, 24 S.Ct. 808, 811–12, 49 L.Ed. 128 (1904) (fundamental constitutional guarantees in favor of individual rights in the Philippines cannot be transcended by Congress); *Downes v. Bidwell*, 182 U.S. 244, 282–83, 21 S.Ct. 770, 785, 45 L.Ed. 1088 (1901) (people of Philippines protected in their personal rights from arbitrary control of Congress in part because of due process and equal protection guarantees of Constitution).

In these cases, the discussion is either dicta or involve legislation of the local commonwealth government; they are nevertheless persuasive. If the Due Process Clause limits the powers of the Territorial governments, it also limits the power of Congress when it legislates with respect to those Territories. *Cf. Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954) ("It would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government.")

The government's reliance on *Dorr v. United States*, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904), which held that trial by jury was not so fundamental that Congress was required to establish such a right for criminal defendants in the Philippines, is misplaced. *Dorr* viewed jury trials as essentially a matter of procedure, 195 U.S. at 144–45, 24 S.Ct. at 811, and stands for the proposition that cultural differences and the right of self-government justify not imposing on local territories a foreign system of justice, where the territory has a long established system providing for fair and orderly trials. *Id.* at 148, 24 S.Ct. at 812. Defendant points to no cultural differences, and the Court cannot contemplate any, justifying deviation from the universal principle that free governments must treat similarly situated persons alike.

20. Justices Brennan and Blackmun argued that the case should not have been disposed of summarily and should have been set down for argument. 446 U.S. at 652, 100 S.Ct. at 1930. Justice Marshall dissented. *Id.*

rational basis for Congress' decision. *Id.* at 651–52, 100 S.Ct. at 1930. But requiring a rational basis implicitly recognizes that Congress' power was not absolute; given the nature of the claim, it is apparent that it was the equal protection component of the Due Process Clause that provided the limitation.

In sum, the Due Process Clause, including its equal protection component, applies and limits Congress' power to make arbitrary classifications in programs that affect residents of unincorporated Territories.

■ As for the level of scrutiny to be applied to the classification made by § 107, giving *Rosario* a faithful reading the Court must apply the rational basis test. On this issue, *Rosario* and this case cannot be distinguished.

As for the first factor allegedly distinguishing this case from *Rosario, amicus* points out that the legislation in *Rosario* concerned the level of reimbursement given to the Puerto Rico Government, not the level of benefits given to residents of Puerto Rico; benefit levels were set by the local government, and there was no requirement that an increase in reimbursement lead to an increase in benefit levels. Here, the legislation directly controls the benefits to individuals; the unequal treatment is necessarily felt directly by individuals.

This indirect/direct discrimination distinction is without "substance." *See Harris v. Rosario,* 446 U.S. 651, 653 n. 1, 100 S.Ct. 1929, 1930 n. 1 (Marshall, J., dissenting) ("It is unclear whether the Court's Territory Clause analysis is intended to apply only where the discrimination is against the Government of Puerto Rico and not against persons residing there. Such a distinction would lack substance in any event.") As noted by Justice Marshall, the discrimination against the Government of Puerto Rico under the AFDC program necessarily operated as discrimination against persons residing in Puerto Rico. *Id.*

As for the second distinguishing factor, *amicus* asserts that the Court's holding that Congress could treat a Territory differently for equal protection purposes as long as it had a rational basis for doing so is "loose language that should be understood as limited to the facts before the Court in that case." *Amicus Curiae's* SurReply Brief at 13–14. Similarly, this language merely indicates that the Court "accepted the defendant's contention that the statutory provisions at issue did not draw distinctions based on race or other immutable traits that would subject them to strict scrutiny." *Id.* at 14.

This argument poses a much closer question. Since Puerto Ricans living within the United States were entitled to full AFDC benefits, and all persons residing within Puerto Rico were affected by the lower reimbursement rate regardless of their race or national origin, the key distinction advanced and accepted may have been of residence; in effect, the Court may have treated the case as a right-to-travel case.[21] The disabling characteristic for plaintiffs in *Rosario,* therefore, was not an immutable trait; they, and persons like them, could simply move to the United States.[22] Here, of course, the disabling trait is immutable—Philippine Army veterans cannot change their past status.[23]

Nevertheless, the Court declines to distinguish *Rosario* on this basis. There is nothing in the *Rosario* opinion to suggest that its holding was limited to the facts before it. Given the statute's facially discriminatory nature and the Court's broad holding, this Court is constrained to read *Rosario* as it is written.

---

**21.** The sole authority for the Court's decision was *Califano v. Torres,* 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978). This case is discussed *infra* note 24.

**22.** In *Califano,* the Court presumed that travel between Puerto Rico and the United States was unrestricted. 435 U.S. at 4 n. 6, 98 S.Ct. at 908 n. 6.

**23.** It is worth noting that before Congress enacted § 107(a), the Veterans' Administration, pursuant to a request by Congress, advised that members of the Philippine Army were veterans, i.e., they served in the active military or naval forces of the United States. *See Filipino Veterans,* 391 F.Supp. at 1317–18.

The failure to extend a federal program to Territories is always subject to attack on the grounds that it is based on impermissible considerations of race or national origin. The Court's holding that the Territory Clause permits such exclusion so long as there is a rational basis must be read as rejecting that attack for all generally applicable federal programs. Rather than examining whether the exclusion is based on impermissible considerations of race or national origin, the Court must examine whether the exclusion has a rational basis in light of the nature of the federal program.

Under the rational basis test, the legislature lacks the "power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Johnson v. Robison*, 415 U.S. 361, 374–75, 94 S.Ct. 1160, 1169, 39 L.Ed.2d 389 (1974) (quoting *Royster v. Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)). The nature and objectives of the federal program at issue, then, are key. Thus, although the Court held in *Califano v. Torres*[24] and *Rosario*, two cases addressing the constitutionality of limiting governmental benefits available to residents of unincorporated territories, that the rational basis was satisfied, at least in part because of the expense of extending programs to Puerto Rico, it

does not necessarily follow that the test has been satisfied here.

The government contends that the statute's classification is based on the *"time, terms, and conditions of service"* with the American and Allied military forces in the Philippines during World War II, Defendant's Reply Brief at 11 (emphasis in original); and then asserts that these factors supply the rational basis for providing members of the Philippine Army with fewer benefits. For the most part, however, the purported differences in "time, terms, and conditions of service" of members of the Philippine Army compared to members of the Old Philippine Scouts, who are admittedly entitled to full benefits, are not even arguably related to the objectives of veterans' benefits programs. Furthermore, there is no indication that the purported differences in "time, terms, and conditions of service" were given any consideration by Congress as justifying the disparate treatment mandated by § 107(a).

It is readily apparent that there were no significant differences in the command structure of the two units justifying disparate treatment. The plain terms of the President's Order passed command to officers of the U.S. Army. The government concedes that de facto command passed to U.S. Army personnel. And most of the Philippine Army divisions were commanded by U.S. Army officers; similarly, even in those divisions commanded by Philippine officers, U.S. Army personnel filled various staff and command positions. Army Study, *supra* note 9, at 26–27, 29–31.

**24.** 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978). In *Califano v. Torres,* the Court upheld a statute providing for discontinuation of SSI benefits for any month in which the recipient did not live in the United States. The statute excluded Puerto Rico from the definition of United States. Persons who had their benefits terminated after moving to Puerto Rico challenged the statute as a denial of equal protection and an infringement on their right to travel. The district court rejected the equal protection claim but held the statute unconstitutional on the basis of the right to travel. The Supreme Court reversed, holding that there was no unconstitutional infringement on the right to travel. In addition, the Court noted that the equal protection claim was with-

out merit: "Acceptance of that claim would have meant that all otherwise qualified persons in Puerto Rico are entitled to SSI benefits, not just those who received such benefits before moving to Puerto Rico. But the District Court apparently acknowledged that Congress has the power to treat Puerto Rico differently, and that every federal program does not have to be extended to it." 435 U.S. at 3 n. 4, 98 S.Ct. at 907 n. 4.

The parties dispute whether the Court in *Torres* decided the equal protection claim. Since *Rosario* explicitly decided the equal protection claim, using the same holding expressed in footnote 4 of *Torres,* this dispute is irrelevant.

There is nothing to indicate that the length of service for Philippine Army members and Old Philippine Scouts was considered determinative in allocating benefits.[25] The relevant time of service for status as World War II veteran and eligibility for benefits for that service is service on or after December 7, 1941, and before termination of hostilities incident to the war. *See* Hearings, *supra* note 9, at 50. For relevant purposes then, the time of service of Philippine Army members was the same as veterans entitled to full benefits.[26]

Nor is there any indication that other "conditions" of service justified disparate treatment. Rations and other supplies were virtually identical. *See* Army Study, *supra* note 9, at 15. And, of course, on the field of battle they were subject to the same conditions of war. *See id.* at 16–17 ("As far as the fighting and other military operations on Bataan were concerned, the PA [Philippine Army] units were doing exactly the same thing as were the U.S. Army (including the Philippine Scouts)

units on the peninsula."); *see also Filipino Veterans*, 391 F.Supp. at 1325 (Kilkenny, J., dissenting).

The only difference in "time, terms and conditions of service" referred to by Congress as supporting the classification made by § 107(a) concerned rates of pay. The government cites to the following passage in the legislative history to support its contention that this difference justified disparate treatment:

> Upon the principle that the Philippine Army was serving with our Army but was not a part of the armed forces of the United States, the War Department took prompt action to disapprove the proposal to extend the American pay rates to soldiers serving in the Philippine Army and requested that the proclamation making such a promise be rescinded. *Members of the Philippine Army did not actually receive the pay of an American soldier*, which has a direct bearing upon the question as to whether that army is a part of the armed forces of the United States.

---

**25.** Originally, enlistment in the Philippine Army consisted of a 5½ month training program followed by reserve status. *See* Army Study, *supra* note 9, at 9. At oral argument government counsel contended this constituted a difference in term of service justifying different benefit levels. The court disagrees. First, there is no evidence that Congress considered this type of enlistment less worthy for veterans' benefits, when such members were later called into service upon outbreak of war. Similarly, whatever relevancy it may have had for treating Philippine Army veterans differently before the President called them into service, it became irrelevant once they were called into service. At that point, they were no longer "reserves" of the Philippine Army, they became members of the armed forces of the United States fighting on the same terms as other members of the armed forces of the United States.

The President's Order unilaterally and fundamentally altered the status of Philippine Army members. Therefore, the government's argument that the right to benefits should be determined by looking at the status of Philippine Army members in the 1930's, because Filipinos had the choice as to whether to join the U.S. Army, the Old Philippine Scouts, or the Philippine Army, misses the mark. Assuming Filipinos elected to forego status as a United States veteran, and therefore their right to veterans' benefits, that election was before the President's Order. Their choice not to serve as a member

of the United States Armed Forces was not respected; the President drafted them into service anyway.

For the same reasons, passages in the legislative history of § 107 stating that when Congress enacted the Servicemen's Readjustment Act of 1940 it was not contemplated that Philippine Army veterans would be entitled to veterans' benefits, miss the mark. Of course Philippine Army veterans were not considered entitled to veterans' benefits in 1940; that was before the President ordered them into service of the United States Armed Forces; therefore they were not then members of the United States Armed Forces.

**26.** For purposes of length of service and time of service, the only reference to differences between those affected by § 107 and those who are not affected is to the length of service and time of service of the "New Philippine Scouts." These veterans came into being by virtue of Section 14 of the Armed Forces Voluntary Recruitment Act of 1945; this Act called for three year enlistments, and thus the enlistments would continue after independence was granted to the Philippines. In addition, by then hostilities had ceased and the service was limited geographically to the Far East, a geographical limitation not made by the President's Order. But the classification between New Philippine Scouts and other World War II veterans is contained in § 107(b), not § 107(a).

Hearings, *supra* note 9, at 58, *quoted in Filipino Veterans*, 391 F.Supp. at 1318–19 n. 4, *and in* Defendant's Reply Brief at 13. (emphasis supplied in government's reply brief).

This passage is factually misleading; furthermore, the factual predicate (that members of the Philippine Army did not receive the pay of an American soldier) does not support the conclusion drawn (that therefore the Philippine Army was not part of the armed forces of the United States).

Officers of the Philippine Army did in fact receive the same pay as officers of the United States Army. Army Study, *supra* note 9, at 40; Hearings, *supra* note 9, at 47. And enlisted men of the Philippine Army, while receiving less pay than enlisted men of the United States Army, received the same pay as enlisted men in the Philippine Scouts, who are considered veterans of the United States Army and receive full veterans' benefits. Army Study, *supra* note 9, at 34–35; Hearings, *supra* note 9, at 47.

What is perhaps equally important, there is no apparent connection between the amount of pay and status as a member of the United States Armed Forces. What should be all important is the *source* of payment, which was the United States.[27] Although there may very well have been rational reasons for paying members of the Philippine Army (and Old Philippine Scouts) less than members of the United States Army,[28] this has no bearing on their status as members of the Armed Forces. Discrimination in pay rates, even if justified, does not by itself justify discrimination in benefits. At most, the reasons supporting lower pay rates support only lower benefit *rates;* it does not support denying benefits altogether.

Since the United States paid the salaries of Philippine Army veterans and their sala-

ries were equal to other veterans who receive full veterans' benefits, the rate of pay issue does not support the classification made by § 107(a). Indeed, it compels the opposite conclusion—members of the Philippine Army were members of the armed forces of the United States.

In its motion to dismiss, the government points to three reasons supporting the limitations imposed by § 107(a): first, "practical difficulties" in administering benefit programs in the Philippines; second, differences in monetary and living standards; and third, the existence of other forms of aid to the Philippine government. In its Reply, the government also notes the enormous burden on the Treasury that granting full benefits would have entailed. These reasons are insufficient to support the classification made by § 107(a).

The government does not describe what were the "practical difficulties" that prevented full administration of veterans' benefit programs in the Philippines. Nevertheless, the court in *Filipino Veterans* accepted them as the rational basis for § 107. 391 F.Supp. at 1323. This Court cannot.

The obvious difficulty with accepting the "practical difficulties" rationale is that these difficulties did not prevent the government from awarding full benefits to Old Philippine Scouts.[29] Thus, it seems readily apparent that "practical difficulties" is simply a code-word for additional expense.

Logically, the "differences in monetary and living standards" goes to the rate or amount of benefits payable, not to what categories of benefits should be available, *see Filipino Veterans*, 391 F.Supp. at 1323 (after relying on the practical difficulties rationale to uphold the categorical exclusions, using this rationale to uphold the peso-for-dollar rate); defendant does not suggest that this is not the case here. Aside from *amicus'* argument that no oth-

---

**27.** *See* note 13 and accompanying text (discussing transfer of responsibility for pay to U.S.).

**28.** Reasons given for the lower rate of pay include inflationary concerns and the relative pay scale for other public officials in the Philippines. *See* Army Study, *supra* note 9, at 40.

**29.** In fairness to the *Filipino Veterans* court, it should be pointed out that the court did not discuss the Old Philippine Scouts and their entitlement to full benefits. Perhaps their existence and entitlement to full benefits were not brought to the court's attention.

er class of veterans living anywhere else in the world have their benefits adjusted for these reasons, the Court cannot ignore the fact that Old Philippine Scouts receive full benefits at the regular rate. It is hard to see how it is rational to pay members of the Philippine Army at a reduced rate while Old Philippine Scouts, who are subject to the same monetary and living standards, are paid at the regular rate.

The Court also agrees with the dissent in *Filipino Veterans* that the existence of other forms of aid to the Philippine government cannot sustain § 107(a):

> [T]here is nothing in the legislative history to indicate that these funds, or any other funds, were to be used by the Philippine Commonwealth to pay benefits to Filipino veterans in lieu of payment of benefits by the United States. The record shows that no part of the two hundred million dollars has ever been used by the Philippine Commonwealth for such benefits.

391 F.Supp. at 1327 (Kilkenny, J., dissenting).[30] Not only did the other forms of aid not benefit members of the Philippine Army specifically, there is no indication that whatever derivative benefit they did receive from such aid was greater than what was realized by Old Philippine Scouts.

Finally, the "enormous burden" on the Treasury cannot, by itself, sustain § 107(a)'s constitutionality. Admittedly, the Supreme Court in *Rosario*[31] and *Torres*[32] allowed budgetary considerations to help supply the rational basis for not extending AFDC and SSI programs to Puerto

Rico on an equal basis. *See Harris v. Rosario*, 446 U.S. 651, 652, 100 S.Ct. 1929, 1930. But because of the different nature of the programs at issue, those cases are not controlling here.

The AFDC and SSI programs at issue in *Rosario* and *Torres*, and the Veterans' programs at issue here are fundamentally different. Under AFDC and SSI programs, entitlement to benefits depends on present need and present relation to the sovereign. Thus the Court's holding that Congress need not extend federal social welfare programs to residents of Territories should be read simply as recognition that Congress, by electing not to incorporate the Territory, has concluded that residents must look primarily, if not exclusively, to the Territorial government to resolve the ills attacked by social welfare legislation;[33] such legislation affects the entire social and economic fabric of a society and provokes vigorous societal debate about the roles of government and individual in bearing responsibility for the problems addressed by such legislation.

In social welfare programs designed to provide a safety net for those unable to compete successfully in the social economy, being a participant, albeit a largely unsuccessful one, in the social economy provides the nexus between demand and entitlement. The social economies of the States and state residents contribute to the fiscal well-being of the Federal Treasury, but Puerto Rico's does not, or at least not to the same extent.[34] An unsuccessful partic-

---

**30.** The weakness of this rationale is perhaps implicitly recognized by the majority's failure to discuss it, even though the majority found § 107 constitutional.

**31.** *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (per curiam).

**32.** *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam).

**33.** Presumably this underlies the government's argument that Congress intended the Philippine Army to be a distinct, uniquely Philippine institution. That of course was how it was originally envisioned; but this vision was abrogated when the President called the Philippine Army into service of the United States Armed Forces and placed command over it with U.S. officers.

Similarly, the rationale that other foreign aid to the Philippines constituted a substitute for veterans' benefits can be seen as consistent with the view that Philippine Army veterans should look to the Philippine government for veterans' benefits. The inadequacy of this rationale is discussed in the text above.

**34.** Both *Rosario* and *Torres* noted that Puerto Rico residents do not contribute to the Federal Treasury. It was not simply that extending the programs to Puerto Rico would cost a lot of money; it was that Puerto Rico, unlike the States, did not help defray the cost of the programs. It is doubtful, at least, that the Court would have considered budgetary considerations sufficient in *Rosario* and *Torres* had Puerto Rico and its residents contributed a propor-

ipant in a social economy that contributes to the Federal Treasury has a greater claim on the Federal Government for protection from the harsh vagaries of the economy than does an unsuccessful participant in a social economy that does not contribute to the Federal Treasury.

Thus tying eligibility under AFDC and SSI programs to the States' contribution to the Federal Treasury is rational. The tie-in is related to the objectives of the programs and rationally allocates limited resources among competing claimants. Budgetary considerations supplied, at least in part, a rational basis for not extending social welfare programs to Puerto Rico because it helped insure that the government could aid those who were intended to benefit from the programs: unsuccessful participants in the national economy. Given its status as an unincorporated territory, whose residents did not contribute to the Federal Treasury, the Puerto Rican economy and its participants were not part of the national economy. Excluding non-participants of the national economy from benefit programs designed to provide a safety net for the vagaries of the national economy, is a rational way to protect the ability to provide that safety net to participants in the national economy. Thus, the classification at issue in *Rosario* and *Torres* was rationally related to the programs at issue,

because it preserved resources for those who had the greatest claim to those resources.[35]

Veterans' programs have a fundamentally different threshold requirement than what is required for AFDC and SSI benefits. Entitlement is based on *past service* to the sovereign rather than present relation to the sovereign. Once this hurdle is passed, a veteran's entitlement to a pension and other benefits does not depend on the veteran remaining in and a citizen of the United States.[36]

The difference in threshold requirements is critical because the key issue is whether Congress has rationally determined who should be foreclosed from passing the threshold. In AFDC and SSI programs, present relation to the sovereign is the determinative threshold because of the objectives of the programs—to provide a safety net for persons who are part of the national political, social, and economic markets. By contrast, Veterans' programs have a different objective[37]—to provide benefits to persons who provided past military service to the United States—and therefore a different threshold requirement. Therefore, while the nexus between demand and entitlement was somewhat lacking in *Rosario* and *Torres* because the claimants were persons who participated in

tionate share of taxes to defray the cost of the programs.

**35.** Similar to this economic analysis, it is also worth noting that these programs engender vigorous societal debate about the roles of society and the individual in bearing responsibility for the problems of the economy. Thus, the classification is rational because it is directly related to this debate. Those who participated in and are affected by resolution of the debate should bear both the benefits and burdens of the programs resulting from the debate. *Cf. Harris v. Rosario*, 446 U.S. at 652, 100 S.Ct. at 1930 (noting the possible disruption of the Puerto Rican economy that could be caused by higher benefit levels as a rational basis).

**36.** This is so even though some veterans' benefits are designed to ease readjustment back to civilian life. It is clear that this readjustment aim is not limited to civilian life in the United States; Filipinos who served in the Old Philippine Scouts are entitled to full benefits, as are veterans living in other territories. *See* Army Study, *supra* note 9, at 43; Defendants' Motion

to Dismiss at Appendix 2, Quizon v. Veterans Admin., No. 87-2836 (D.D.C. Motion filed Dec. 21, 1987); *see also* 38 C.F.R. §§ 3.8(a), 21.130 (1988).

**37.** This is not to suggest that veterans' benefits programs cannot be characterized as "social welfare" programs; they certainly can (although it might be more appropriate to consider them as social welfare programs for veterans). It serves merely to highlight the different nexus between demand and entitlement that exists with respect to AFDC and SSI programs on the one hand and veterans' benefits programs on the other. Understanding the nexus between demand and entitlement is critical when examining whether budgetary considerations provide a rational basis for classifications in benefit programs. If the classification is not related to this nexus, then it will not have a "fair and substantial relation to the object of the legislation." *Johnson v. Robison*, 415 U.S. 361, 375, 94 S.Ct. 1160, 1169.

a social economy largely independent of the entity upon which the demand was being made, here the nexus between demand and entitlement is fully satisfied. The Philippines' participation in the national economy is irrelevant; it is the member's participation in the armed forces of the United States that is determinative.[38]

As the threshold criterion for entitlement is status as a former member of the United States Armed Forces during World War II, to be rationally related to veterans' programs the classification made by § 107 must be related to some basis for distinguishing among persons claiming that status. As shown above, none of the reasons advanced by Congress or government counsel is related to a basis for distinguishing between veterans and non-veterans. Since members of the Philippine Army are entitled to status as veterans of the United States Armed Forces, then reducing their benefits will not be reducing the benefits of one with a lesser claim to benefits; their claim to benefits is equal to that of those who are entitled to full benefits, including Old Philippine Scouts. It is not "rational" to reduce the benefits of one equally entitled to benefits to insure that someone else, no more entitled to those benefits, receives full benefits. That is the essence of arbitrary treatment.[39]

■ In sum, the reasons proffered by the government do not provide a rational basis for the classification made by § 107(a). The classification is unrelated to

any legitimate objective of the Veterans' benefits programs—to provide benefits for those who served in the armed forces of the United States during World War II. There is no rational basis for concluding that Old Philippine Scouts are World War II veterans but that members of the Philippine Army are not.

## CONCLUSION

Applying the rational basis test, *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980), the Court concludes that § 107(a) cannot be sustained, because the classification it makes is unrelated to any legitimate objective of the Veterans' programs at issue. Therefore the government's motion to dismiss shall be denied. Because the dispositive legal issue has been fully briefed and no questions of material fact remain, summary judgment will be entered for Plaintiff.

An appropriate Order accompanies this Memorandum.

## ADJUDICATION AND ORDER

In accordance with the Memorandum entered this date, it is by the Court this 12th day of May, 1989,

ADJUDGED and DECREED, that 38 U.S.C. § 107(a), insofar as it determined that service in the Philippine Army while the Philippine Army was in the service of the armed forces of the United States pur-

---

**38.** Of course, once a veteran meets the past service requirement, need is still relevant to the determination or benefits. But need is used more as a way to adjust the level of benefits rather than to determine eligibility for benefits. The specific benefit at issue in this case, survivors' benefits for non-service connected death, 38 U.S.C. § 541, adheres to this principle. The statute provides that benefits "shall [be paid] to the surviving spouse of each veteran who met the service requirements prescribed in section 521(j) of this title." 38 U.S.C. § 541(a). The amount payable may then be adjusted by reducing it by the amount of the spouse's annual income, *e.g., id.* § 541(b); it can also be denied or discontinued on the basis of a general net worth standard. *Id.* § 543.

In any event, that need is considered within the context of Veterans' programs does not alter the fundamentally different nexus between demand and entitlement as to the AFDC and SSI programs compared to that for Veterans' programs.

**39.** Although perhaps not legally determinative, it is worth noting that the impact on the budget was different in kind in *Rosario* and *Torres* compared to the instant case. The budgetary impact of fully extending AFDC and SSI programs to Puerto Rico would be open-ended; for as long as the Federal Government assisted the States, this increase would continue.

The budgetary impact of extending full veterans' benefits to the Philippines, although extending over a substantial period of time, is not open-ended. The increased outlays are tied to benefits available to a specific, limited group of beneficiaries; when these beneficiaries exhaust their entitlement, the impact on the budget will cease.

suant to the military order of the president dated June 26, 1941 shall be deemed not to have been service in the active military, naval or air service for the purpose of conferring veterans' benefits, except for the benefits specifically enumerated in § 107(a), and insofar as it determines that benefits payable to veterans of the Philippine Army who served pursuant to said military order of the President shall be paid at a reduced rate, is unconstitutional to the extent it deprives Philippine Army veterans and their dependents of benefits administered by the Veterans' Administration and requires that benefits that are available to said veterans and their dependents be paid at a reduced rate; therefore, it is by the Court,

ORDERED, that Defendant's Motion to Dismiss is DENIED; and it is

FURTHER ORDERED, that Plaintiff's application for benefits under 38 U.S.C. § 541 is hereby remanded to the Veterans' Administration for consideration in accordance with the Court's disposition in this matter, and therefore Defendant shall not deny or reduce benefits on the basis of 38 U.S.C. § 107(a).