**Porferio NARISMA, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 86–1372–AER.**

United States District Court, District of Columbia.

May 10, 1990.

Porferio Narisma, Butuan City, Philippines, pro se.

Daniel J. Standish, U.S. Attorney's Office, Washington, D.C., for defendant.

Albert J. Beveridge, III, Kenneth Steven Kaufman, Beveridge & Diamond, P.C., Washington, D.C., amicus curiae.

MEMORANDUM

AUBREY E. ROBINSON, Jr., Chief Judge.

This case presents the question, unaddressed by the Court's earlier decisions in

similar so-called Filipino cases,[1] whether title 38 of the United States Code, section 107(b)[2] comports with the Fifth Amendment to the Constitution. The provision excludes all but certain life insurance and service-related disability and death benefits for Filipino citizens who enlisted in the "New Philippine Scouts" pursuant to the Armed Forces Voluntary Recruitment Act of 1945.[3]

Defendant Veterans' Administration (hereinafter "the VA") has moved to dismiss, and has offered a Memorandum addressing the constitutionality of section 107(b). *Amicus curiae*[4] has responded at length to the latter. Defendant's motion will be granted with respect to claims for Social Security and life insurance benefits, and for back-pay. It will be denied with respect to claims seeking other benefits administered by the VA.

The VA offers various reasons why the limitations of section 107(b) are distinguishable from those in section 107(a). By its terms, section 107(a) limited benefits for regular Philippine Army veterans of World War II. Last year this Court held that the provision violated the Fifth Amendment's equal protection component. *See Quiban v. United States Veterans' Admin.*, 713 F.Supp. 436 (D.D.C.1989).

The Court disagrees with the VA that the holding in *Quiban* can be distinguished on the facts and circumstances behind the creation of the New Philippine Scouts; the VA has not advanced a rational basis for withholding certain benefits from New Philippine Scouts while providing those benefits to other similarly situated U.S. armed forces veterans. Consequently, the · Court holds, as it did with respect to section 107(a), that section 107(b) violates the Fifth Amendment of the Constitution.

## I. BACKGROUND

As is the case with many similar complaints Plaintiff's pleading is signed by "Francisco M. Havana" as counsel. Mr. Havana is not a member of this Court's bar, and the pleadings bearing his name offer little assistance to the Court in these matters. The Court will treat Plaintiff's case as though filed *pro se* and construe the allegations of the complaint with due liberality. *See Pospos v. United States Veterans' Administration*, No. 86–5494, slip op. at 1–2 (D.C.Cir. May 22, 1987).

Liberally construed, plaintiff seeks military pay or allowances, social security and veterans' benefits, including insurance payments, for his service in the Philippine armed forces during World War II.[5] He alleges service in two separate services; first as a private in the "National Volunteers of the Philippines" from some date prior to December, 1941 through May, 1942. As dis-

---

**1.** *See Quiban v. United States Veterans' Admin.*, 713 F.Supp. 436 (D.D.C.1989); *Quizon v. United States Veterans' Admin.*, 713 F.Supp. 449 (D.D.C. 1989).

**2.** In relevant part, 38 U.S.C. § 107(b) provides:
Service in the Philippine Scouts under section 14 of the Armed Forces Voluntary Recruitment Act of 1945 shall not be deemed to have been active military, naval, or air service for the purpose of any of the laws administered by the Veterans' Administration except—
(1) with respect to contracts of National Service Life Insurance entered into (A) before May 27, 1946, (B) under section 620 or 621 of the National Service Life Insurance Act of 1940, or (C) under section 722 of this title; and
(2) chapters 11 and 13 (except section 412(a)) of this title.
Payments under such chapters shall be made at a rate in pesos as is equivalent to $0.50 for each dollar otherwise authorized, and where

annual income is a factor in entitlement to benefits, the dollar limitations in the law specifying such annual income shall apply at a rate in Philippine pesos as is equivalent to $0.50 for each dollar.
*Id.*

**3.** *See infra* note 6.

**4.** Beveridge & Diamond of Washington, D.C. Again, the Court commends Beveridge & Diamond for its tireless efforts in these cases.

**5.** The VA suggests that plaintiff also petitions for naturalization under a World–War II era immigration and naturalization statute. Despite plaintiff's vague reference to the "Nationalisation Act of 1940" (sic), the Court declines to construe the complaint as one seeking such relief. It is clear by the emphasis and context of the pleading that it seeks benefits arising out of plaintiff's World War II military service, and nothing more.

cussed below, any veterans' benefits due plaintiff because of this service are governed by the Court's decisions in *Quiban v. United States Veterans' Admin.*, 713 F.Supp. 436 (D.D.C.1989) or *Quizon v. United States Veterans' Admin.*, 713 F.Supp. 449 (D.D.C.1989).

Plaintiff also alleges service for two years and ten months as a private in the New Philippine Scouts, having enlisted on May 13, 1946, and received an honorable discharge on February 13, 1949. It appears then, that plaintiff's later service was pursuant to section 14 of the Armed Forces Voluntary Recruitment Act of 1945 (hereinafter "the Recruitment Act").[6] The Recruitment Act authorized the Secretary of War of the United States to enlist 50,000 Filipino citizens for service in the Philippine Scouts. The enlistments were fixed at three years, unless sooner terminated.

The Recruitment Act, however, was not limited to raising troops in the Philippines. It was designed to facilitate recruitment in the regular United States armed forces as a whole. Section 3 of the Recruitment Act authorized and directed the Secretary of War to accept original enlistments and re-enlistments in the regular armed forces for periods of 18 months, two years or three years, at the option of the enlistee. *See* Recruitment Act § 3, 59 Stat. 538, 538.

Significantly, with respect to veterans' benefits, the Recruitment Act amended various sections of the Servicemen's Readjustment Act of 1944 to provide that World War II "shall not be considered as terminating, in the case of any individual, before the termination of such individuals first period of enlistment or reenlistment con-

tracted within one year after the date of the enactment of the [Recruitment Act]." Recruitment Act § 11, 59 Stat. at 542.[7]

## II. DISCUSSION

### A. *Social Security, Military Pay, and Insurance Benefits*

■ Plaintiff here presents several claims similar to those the Court considered in *Quizon*, which do not turn on the application of section 107. For example, to be successful in obtaining Social Security benefits, a plaintiff must have presented a claim to the Social Security Administration. Plaintiff here has not done so, and his claim is barred by a failure to exhaust administrative remedies. Plaintiff's insurance claims are also presently barred by the exhaustion doctrine, there being no evidence that plaintiff ever pursued the matter before the Veterans' Administration. He may do so on the remand to the agency ordered below. *See generally Quizon v. United States Veterans' Admin.*, 713 F.Supp. 449, 451, n. 3 (D.D.C.1989). Lastly, any claim for back-pay has long been time-barred. *See Pospos*, slip op., at 5.

### B. *Veterans' Benefits*

■ To the extent Plaintiff alleges that his initial service (1941–1942) was with the regular Philippine Army or with a recognized guerilla force in the Philippines, his entitlement to veterans' benefits without regard to the limitations of section 107(a) is compelled by *Quiban v. United States Veterans' Admin.*, 713 F.Supp. 436 (D.D.C. 1989) or *Quizon v. United States Veterans' Admin.*, 713 F.Supp. 449 (D.D.C.1989).

---

**6.** Pub.L. No. 79–190, § 14, 59 Stat. 538, 543 (1945). Section 14 of the Recruitment Act provided:

> The Secretary of War, with the approval of the Philippine Government, is hereby authorized to enlist in the Philippine Scouts, with pay and allowances authorized under existing law, fifty thousand men for service in the Philippine Islands, in the occupation of Japan and of lands now or formerly subject to Japan, and elsewhere in the Far East. Such enlistments shall be for three years unless sooner terminated and citizens of the Philippine Islands shall be eligible to volunteer for such service.

*Id.*

By its reference to the Philippine Scouts and existing law, this section appears to be little more than an extension and expansion of the authority to maintain the Old Philippine Scouts, a unit first authorized in 1901 but limited to 12,000 men. In addition, in this legislation the enlistments were with the approval of the Philippine Government, presumably in light of the impending independence of the Philippines.

**7.** Plaintiff is covered by this section. The Recruitment Act was approved October 6, 1945; plaintiff enlisted on May 13, 1946.

Plaintiff also alleges service with the New Philippine Scouts. In *Quizon,* the Court specifically reserved judgment on the constitutionality of the provision limiting benefits for that group, section 107(b). *See Quizon,* 713 F.Supp. at 452 n. 2. It now holds that section 107(b) fails the test of rationality, and is unconstitutional.

In *Quiban,* this Court held that the Supreme Court's decision in *Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) compelled the application of the "rational basis test," rather than some stricter level of scrutiny, to legislation enacted pursuant to the Territory Clause of the Constitution.[8] Under the rational basis test, the legislature lacks the "power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Johnson v. Robison,* 415 U.S. 361, 374–75, 94 S.Ct. 1160, 1169–70, 39 L.Ed.2d 389 (1974) (quoting *F.S. Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561–62, 64 L.Ed. 989 (1920)).

Recognizing that the Court has determined that eligibility criteria for veterans' benefits—and hence the constitutionality of section 107—must relate to status as a veteran,[9] the VA raises several purported differences between New Philippine Scouts and Old Philippine Scouts and other units, including those covered by *Quiban,* that it asserts justify a finding that members of the New Philippine Scouts have a different "status" in the armed forces.

Primarily these are: (1) because the independence of the Philippines was pending and the force would form the nucleus of the new Philippine Army, the force was a transitional, temporary one, as demonstrated by the limited term of enlistment, three years; (2) the New Philippine Scouts were an "occupation" force and would not see combat; and (3) the limited nature of the force justified a corresponding limitation on any long-term burden upon the national treasury.

The thrust of the VA's overall argument is that the "time, terms and conditions" of service for the New Philippine Scouts differed from both Old Philippine Scouts and from regular U.S. armed forces veterans who enlisted under the Recruitment Act. Intertwined in this assertion is the notion that the true purpose of the formation of the New Philippine Scouts was to "help the Philippines help themselves"—eventually, the Philippine Government would assume responsibility for this group.

---

8. *See Quiban,* 713 F.Supp. at 442. By a Memorandum of Supplemental Authority, the Government cites a recent Supreme Court decision for the proposition that the Fifth Amendment does not circumscribe Congress' power to limit Filipino veterans' benefits at all. In *United States v. Verdugo–Urquidez,* —— U.S. ——, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), the Court held that the Fourth Amendment did not apply to searches and seizures by U.S. agents of property owned by a non-resident alien in a foreign country. In doing so, the Court reaffirmed the so-called *Insular Cases,* and their admonition that "not every constitutional provision applies to governmental activity even where the United States has sovereign power." *Id.* 110 S.Ct. at 1062. As to those individuals in territories "not clearly destined for statehood," the Constitution guarantees only those rights which can properly be deemed "fundamental." *Id.*

As in *Quiban,* the Government identifies the right at stake in this litigation as the "right to veterans' benefits." Def. Supp. Mem. at 4. This is plainly incorrect. The right at stake is instead the right not to receive arbitrary treatment at the hands of the Government, as guaranteed by the Fifth Amendment. *Quiban* recognized this. *See Quiban,* 713 F.Supp. at 440 n. 17. Narisma seeks to vindicate the identical right.

If there was any question whether the right to equal protection under the law in the veterans context was a "fundamental" one, *Quiban* answered it. "[I]t cannot be characterized as anything but a 'fundamental limitation in favor of personal rights.'" *Id.* at 441 (quoting *Filipino American Veterans v. United States,* 391 F.Supp. 1314, 1321 (N.D.Cal.1974) (three judge panel)).

9. The Government, of course, does not concede that *Quiban* was properly decided, and advances many of the same arguments it raised in *Quiban.* The Court concentrates here on the arguments attempting to distinguish this case from *Quiban.*

1. The Three Year Limitation of Service

The VA points to several passages in the legislative history to section 107(b) it reads as indicating that Congress considered the force to be temporary and transitional. The VA also points to the three year term of enlistment as further proof of the "temporary" nature of the force.

The VA's focus on the three year period is inapposite. First, relative to regular American enlistees, the three year period is quite long. The Recruitment Act provided for enlistments of 18 months, two or three years. Recruitment Act § 3, 59 Stat. at 538. The VA does not contend that any of these enlistments were insufficient to confer veterans' status on enlistees for the purposes of veterans' benefits. Those who enlisted in the New Philippine Scouts did so for the *maximum* term. As for length of service, therefore, there is no basis for distinguishing as "temporary" those who enlisted pursuant to section 14 (New Philippine Scouts) and those who enlisted pursuant to section 3.

Second, although the Recruitment Act limited individual enlistments as it did, the Act did not limit the duration of the *force* itself. The New Philippine Scouts did not terminate as a fighting force on any date certain. Moreover, the VA makes much of Congress' supposed interest in putting together a Philippine Army of which a nascent Philippine Government could later take control. Yet the United States also formed the New Philippine Scouts for use in the Pacific theater alongside American forces and under U.S. command. It is difficult to see how the "status" of a New Philippine Scout as a veteran can be affected by what became of his outfit at some subsequent date.

The Court reached an analogous conclusion in *Quiban,* where it is said that "[v]eterans' programs have a fundamentally different threshold requirement than what is required for [welfare programs]. Entitlement is based on *past service* to the sovereign rather than present relation to the sovereign. *Quiban,* 713 F.Supp. at 447 (emphasis in original). As a matter of logic, when making the "status" and conse-

quent "entitlement" determination, the focus must be upon the period of service, and not on later events.

In addition, the Court's opinion denying reconsideration of the decision in *Quiban* also rejected the idea that imminent Filipino independence could justify differing treatment for veterans from that nation:

> First, it has nothing to do with the status of Philippine Army veterans as United States Forces veterans; other foreign nationals, including the Old Philippine Scouts, do not have their benefits limited simply because their service with the United States Armed Forces can be viewed also as service for their countries. Second, that the new Philippine Government could be expected to provide for veterans' benefits for these veterans— even though at the time it was recognized that they were unable to do so on a large scale—is irrelevant to their eligibility for Veterans' benefits in general and to survivors' benefits in particular. If Philippine Army veterans received Philippine veterans' benefits, the receipt of such benefits would only go to their *need* for U.S. Veterans' benefits and the *amount* of benefits to be awarded, not their eligibility for benefits, which as the Court previously noted is determined solely by status.

*Quiban v. U.S. Veterans' Administration,* 724 F.Supp. 993, 1003 (D.D.C.1989) (emphasis in original) (citing *Quiban,* 713 F.Supp. at 448 n. 38).

2. The New Philippine Scouts Were an Occupation Force and Would Not See Combat

The VA next claims that "because the force came into existence after the hostilities of the war ended, its members were not entitled to benefits that would be accorded to those individuals who participated in combat." Def. Mem. at 6. This argument is directly contradicted by the Recruitment Act itself, which provided in section 11 that World War II "shall *not* be considered as terminating, in the case of *any* individual, before the termination of such individuals first period of enlistment

or reenlistment contracted within one year after the date of the enactment of the [Act]." Recruitment Act § 11, 59 Stat. at 542 (emphasis added).[10] This section was directly tied to veterans' benefits, for the obvious purpose of protecting the enlistee's status as a World War II veteran. *See* H.R.Rep. No. 943, 79th Cong., 1st Sess. (1945). It is fair to assume that this protection was to provide a further inducement to enlist.[11]

In addition, the New Philippine Scouts enlisted "for service in the Philippine Islands, in the occupation of Japan, and of lands now or formerly subject to Japan, and elsewhere in the Far East." Recruitment Act § 14, 59 Stat. at 543. The Court reads this section, as *amicus* suggests, to mean that occupation *and* other service was contemplated. Indeed, the Senate originally sought the force solely for the occupation of Japan. The Conference Committee specifically added language to permit occupation of Japanese territories and service beyond occupation in the Philippines and the Far East. *See* H.R.Conf.Rep. No. 1075, 79th Cong., 1st Sess. (1945) (Statement of the Managers on the Part of the House).

Section 14 itself therefore states that the Scouts would *occupy* Japanese territories, and *serve* elsewhere in the Far East. This constitutes a "condition" of service no different than other soldiers in the U.S. armed forces who served in the Far East under the Recruitment Act. They too would occupy the territory of the defeated enemy, and serve elsewhere as circumstances dictated.

Moreover, there was no guarantee that combat conditions would not break out, in the Philippines, in Japan, or elsewhere in the Far East. If this occurred, members of the New Philippine Scouts obviously could not claim exemption from combat duty. In sum, the Court finds that this "condition of service" is insufficient to distinguish New Philippine Scouts from other veterans entitled to receive full benefits.

### 3. Cost as a Rational Basis

In *Quiban*, the Court dealt comprehensively with the issue whether cost was a rational consideration in differentiating between groups within the United States armed forces. It distinguished Supreme Court precedent using budgetary considerations as a rational basis for legislation which declined to extend welfare programs to Puerto Rico. *Quiban*, 713 F.Supp. at 446 (discussing *Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980); *Califano v. Torres*, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam)). Again, the key was "status."

Would-be welfare recipients in Puerto Rico were not part of the national economy and did not contribute to the Federal Treasury, hence it was rational to exclude them

---

**10.** In any event, plaintiff does not need the protection of this provision, at least for some benefits. *See infra* note 11. But it is persuasive authority for the proposition that immediate post-war, even "occupation," duty is sufficiently similar to "combat" duty during active hostilities for purposes of determining World War II veteran status.

**11.** It should also be pointed out that section 107(b) was enacted after plaintiff enlisted; many others had presumably enlisted pursuant to the Act before section 107(b) was enacted. As the New Philippine Scouts seem to be an extension of the Old Philippine Scouts, who are entitled to full benefits, it appears that section 107(b) retroactively altered their entitlement to full benefits.

It also worth noting that, for some benefits at least, plaintiff did not even need the protection of section 11 of the Recruitment Act. With certain exceptions, title 38 of the U.S. Code defines World War II as "the period beginning on December 7, 1941, and ending on December 31, 1946." 38 U.S.C. § 101(8). Plaintiff enlisted on May 13, 1946, six and one-half months prior to the "end" of World War II. And to obtain non-service connected disability pension, for example, (a benefit not available to New Philippine Scouts), the service requirements are only 90 days during a period of war.

World War II is defined more expansively for chapters 31 and 37. *See* 38 U.S.C. § 1501(1) (for purposes of chapter 31, World War II "means the period beginning on September 16, 1940, and ending on July 25, 1947"); 38 U.S.C. § 1801(a)(1) (for purposes of chapter 37, World War II "means the period beginning on September 16, 1940, and ending on July 25, 1947, and ... includes, in the case of any veteran who enlisted or reenlisted in a Regular component of the Armed Forces after October 6, 1945, and before October 7, 1946, the period of the first such enlistment or reenlistment").

from entitlement programs designed to benefit persons who met these conditions. Members of the Philippine Army at issue in *Quiban,* on the other hand, had met the threshold "status" requirement for entitlement to veterans' benefits: their former relation to the sovereign was identical to other World War II veterans. Similarly, based upon the conclusions above that no valid distinction separates them from other veterans, New Philippine Scouts also meet the "status" requirement. They too offer a "nexus between demand and entitlement," because they served as members of the United States armed forces in a capacity not distinguishable from any other members in the immediate post-war period. *See Quiban,* 713 F.Supp. at 448.

As the Court concluded in *Quiban,* "[i]t is not 'rational' to reduce the benefits of one equally entitled to benefits to insure that someone else, no more entitled to those benefits, receives full benefits. That is the essence of arbitrary treatment." *Quiban,* 713 F.Supp. at 448.

### III. CONCLUSION

Plaintiff's claims for Social Security and insurance benefits must be dismissed for failure to exhaust administrative remedies. To the extent plaintiff seeks back-pay, his claim is time-barred. To the extent his complaint seeks veterans' benefits as a former member of the Philippine military during World War II, however, it will be treated as an administrative request and remanded for consideration by the Veterans' Administration.

The VA's efforts to distinguish the status of New Philippine Scouts from other members of the United States armed forces, so as to rationally justify their limited entitlement to benefits, are unsuccessful. The New Philippine Scouts enlistment period actually exceeded those available to other American enlistees during the same time period. The force served functions identical or similar to regular U.S. armed forces veterans in the Pacific sphere at the time. That a military force derived from the New Philippine Scouts would ultimately make up the newly independent Philippine

Army has no effect whatsoever on the "status" of the Scouts—and it is status that the Court has found to be determinative in conducting the rational basis analysis in this context. Finally, since the VA has not distinguished the status of the New Philippine Scouts as veterans, the desire to avoid a burden on the treasury cannot justify section 107(b).

Lacking a rational basis for its limitation of benefits to this group, the Court finds section 107(b) in violation of the Fifth Amendment, and remands this case to the Veteran's Administration for an examination of plaintiff's claims, during which the VA may not rely upon the provision.

An appropriate Order accompanies this Memorandum.

### ADJUDICATION AND ORDER

In accordance with the Memorandum entered this date, it is by the Court this 10th day of May, 1990,

ADJUDGED and DECREED, that 38 U.S.C. § 107(b), insofar as it determines that service in the Philippine Scouts under section 14 of the Armed Forces Voluntary Recruitment Act of 1945 ("New Philippine Scouts") shall not be deemed to have been active military, naval, or air service for the purposes of conferring veterans' benefits, except for the benefits specifically enumerated in section 107(b), and insofar as it determines that benefits payable to veterans of the New Philippine Scouts shall be paid at a reduced rate, is unconstitutional to the extent it deprives veterans of the New Philippine Scouts and their dependents of benefits administered by the Veterans' Administration and requires that benefits that are available to said veterans and their dependents be paid at a reduced rate; and it is

FURTHER ADJUDGED and DECREED, that 38 U.S.C. § 107(a), insofar as it determines that service in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the United States pursuant to the military order of the President dated July 26, 1941, including the Philippine Army and organized guerilla

forces, shall be deemed not to have been service in the active military, naval or air service for the purpose of conferring veterans' benefits, except for the benefits specifically enumerated in § 107(a), and insofar as it determines that benefits payable to veterans of said forces shall be paid at a reduced rate, is unconstitutional to the extent it deprives veterans of said forces and their dependents of benefits administered by the Veterans' Administration and requires that benefits that are available to said veterans and their dependents be paid at a reduced rate; therefore it is by the Court,

ORDERED, that Defendant's Motion to dismiss is GRANTED to the extent it seeks dismissal of claims seeking Social Security benefits, back-pay and benefits under any federal veterans insurance contract; and it is

FURTHER ORDERED, that Plaintiff's claims for Social Security benefits and benefits under any federal veterans insurance contract are hereby dismissed for failure to exhaust administrative remedies; and it is

FURTHER ORDERED, that Plaintiff's claim for back-pay is dismissed as time-barred; and it is

FURTHER ORDERED, that in all other respects Defendant's Motion is DENIED; and it is

FURTHER ORDERED, that Plaintiff's complaint shall be treated as an administrative application for benefits and is hereby remanded to the Veterans' Administration for consideration in accordance with Court's disposition in this matter, and therefore Defendant shall not deny or reduce benefits on the basis of 38 U.S.C. § 107.