**Felomina QUIBAN**

v.

**VETERANS ADMINISTRATION, Appellant.**

**Leonila A. QUIZON**

v.

**VETERANS ADMINISTRATION, Appellant.**

**Porferio NARISMA**

v.

**UNITED STATES of America, Appellant.**

Nos. 89–5250, 89–5251, 89–5263 and 90–5193.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 14, 1991.

Decided March 29, 1991.

As Amended March 29, 1991.

Alfred Mollin, Atty., Dept. of Justice, with whom Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., William Kanter, Atty., Dept. of Justice, and Raoul L. Carroll, Gen. Counsel, Dept. of Veterans Affairs, were on the brief, for appellant, Veterans Admin.

Kenneth S. Kaufman, with whom Albert J. Beveridge, III, was on the brief, for amicus curiae, Veterans Federation of the Philippines, urging affirmance.

Before RUTH BADER GINSBURG, D. H. GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge RUTH BADER GINSBURG.

RUTH BADER GINSBURG, Circuit Judge:

Just before the beginning of World War II, President Roosevelt invoked his power under the Philippine Independence Act, Pub.L. No. 73–127, § 2(a)(12), 48 Stat. 456, 457 (1934), to call various Philippine military organizations "into the service of American armed forces." 6 Fed.Reg. 3825 (1941). The first [1] and second [2] Supplemental Surplus Appropriation Rescission Act of 1946 provided, however, that service by such Philippine organizations "shall not be deemed to have been active military, naval, or air service" for purposes of diverse veterans benefit programs. *See* 38 U.S.C. § 107 (1988). As a result, most Philippine veterans of World War II are statutorily ineligible for several United States veterans benefits. *See* 38 U.S.C. § 101(2) (defining "veteran" as a person "who served in the active military, naval, or air service").

Two Philippine World War II veterans and one surviving spouse of such a veteran, all residents of the Philippines, filed complaints in our district court, challenging

---

1. Pub.L. No. 79–301, 60 Stat. 6, 14 (1946) (codified as amended at 38 U.S.C. § 107(a) (1988)).

2. Pub.L. No. 79–391, 60 Stat. 221, 223 (1946) (codified as amended at 38 U.S.C. § 107(b) (1988)).

their exclusion from certain veterans benefits as contrary to the Fifth Amendment's guarantee of equal protection.[3] The district court granted summary judgment for the challengers on their constitutional claims. *See Quiban v. United States Veterans Admin.*, 713 F.Supp. 436 (D.D.C. 1989); *Quizon v. United States Veterans Admin.*, 713 F.Supp. 449 (D.D.C.1989); *Narisma v. United States*, 738 F.Supp. 548 (D.D.C.1990). Under binding Supreme Court precedent, however, *see Harris v. Rosario*, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980), we must reverse. The classifications in question, controlling authority instructs, have the requisite rationality.

## I.

The benefit status of Philippine World War II veterans is entwined with the history of United States–Philippine relations. One group of Philippine veterans belonged to a military organization, now called the "Old Philippine Scouts," that our government established in 1899, one year after the United States took over the Philippines from Spain. Congress soon incorporated these troops, with an authorized strength of 12,000, into the regular United States Army. *See* Act of February 2, 1901, § 36, 31 Stat. 748, 757–58. The Old Philippine Scouts have always been considered members of the United States Army and have always received full United States veterans benefits. Their entitlement to benefits, while relevant, is thus not directly at issue in these appeals.

In 1902, shortly after organizing the Old Scouts, Congress established a territorial government in the Islands. Apparently, however, the United States never intended to incorporate the Philippines, and by 1916 Congress indicated its intention eventually to grant the Islands their independence. *See Quiban*, 713 F.Supp. at 437–38. Finally, after years of discussion, Congress passed the Philippine Independence Act of

1934; pursuant to that Act, the Philippines became a self-governing nation on July 4, 1946. *See* Pub.L. No. 73–127, § 10(a), 48 Stat. 456, 463 (1934). Pending full independence, the Act authorized the Philippines to adopt a constitution and organize a new government. The Philippines did so in 1935, and in that same year, the Commonwealth legislature, established the Philippine Army.

The Independence Act contained a provision crucial to the status of the approximately 200,000 to 300,000 World War II veterans of the Philippine Army. Section 2(a)(12) of the Act authorized the United States, before Philippine independence,

> to maintain [United States] military and other reservations and armed forces in the Philippines, and, upon order of the President, to call into the service of [United States] armed forces all military forces organized by the Philippine government.

Some months before the Japanese attack on Pearl Harbor, President Roosevelt exercised this authority to call up the Philippine Army. In his military order of July 26, 1941, Roosevelt commanded:

> I hereby call and order into the service of the armed forces of the United States for the period of the existing emergency, and place under the command of a General Officer, United States Army, ... all of the organized military forces of the Government of the Commonwealth of the Philippines....

6 Fed.Reg. 3825 (1941).

United States officers were largely responsible for training the Philippine Army after it had been called into the service of our armed forces, and the United States paid the costs of training and mobilization. *See* Office of the Center for Military History, The Status of Members of Philippine Military Forces During World War II, at 11–12 (June 1973) (unpublished manuscript prepared for the government's use in *Fili-*

---

**3.** The Constitution's equal protection clause is contained in the Fourteenth Amendment, which governs action by the states. The Supreme Court has held, however, that a similar constraint, governing federal action, is implicit in the due process clause of the Fifth Amendment. *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228 n. 2, 43 L.Ed.2d 514 (1975); *Bolling v. Sharpe*, 347 U.S. 497, 499–500, 74 S.Ct. 693, 694–95, 98 L.Ed. 884 (1954).

*pino American Veterans & Dependents Ass'n v. United States*, 391 F.Supp. 1314 (N.D.Cal.1974) (three-judge court)) (hereinafter, "OCMH Study"), *reprinted in* Joint Appendix ("J.A.") at 27, 38–39. After the outbreak of war, Congress authorized $269 million to mobilize, train, equip, and pay the Philippine Army, and it gave General MacArthur, commander of the United States Armed Forces in the Far East ("USAFFE"), authority to allocate expenditures. *See* OCMH Study at 12–13, J.A. at 39–40.

During the Japanese invasion, Philippine soldiers fought bravely alongside other members of USAFFE. Both Americans and Filipinos suffered the terrible Bataan death march; indeed, Philippine soldiers endured particularly cruel treatment from the Japanese. *See* OCMH Study at 19–20, J.A. at 46–47; *cf. Immigration & Naturalization Serv. v. Pangilinan*, 486 U.S. 875, 886, 108 S.Ct. 2210, 2217, 100 L.Ed.2d 882 (1988) (acknowledging that Filipino soldiers "fought so valiantly during the early months of [United States participation in] World War II [and] were regarded with especial esteem"). Philippine guerrilla forces continued to fight during the Japanese occupation; their efforts undoubtedly made American reentry into the Philippines much less costly. *See* OCMH Study at 48–58, J.A. at 75–85.

Filipinos, however, were never paid wages equal to those that Americans received, despite General MacArthur's recommendations and some early support by the War Department for pay equality. The Philippines did, without American opposition, raise pay for Philippine Army enlisted personnel to the higher level enjoyed by Philippine Scouts, but both groups received only a fraction of the pay that American enlisted personnel received. *See* OCMH Study at 34–35, J.A. at 61–62. Just after American reentry in October 1944, the Phil-

ippine president attempted to raise pay rates for Philippine enlisted soldiers to the U.S. Army level, apparently with MacArthur's concurrence. By that time, however, the War Department resisted. The Department cited not just the consequences to the United States treasury, but also the lower cost and standard of living in the Philippines, the inflationary consequences of paying Philippine soldiers wages that vastly exceeded those of most Philippine workers and government officials, and the Philippine government's likely inability to continue the higher rates of pay after independence. *See* OCMH Study at 37–41, J.A. at 64–68.

Two months after the Japanese surrender, Congress passed the Armed Forces Voluntary Recruitment Act of 1945, one provision of which authorized the Secretary of War, with Philippine approval, to enlist fifty thousand new Philippine Scouts. The New Scouts were to participate "in the occupation of Japan and of lands now or formerly subject to Japan, and elsewhere in the Far East." Pub.L. No. 79–190, § 14, 59 Stat. 538, 543 (1945).[4] Only citizens of the Philippines were eligible to enlist in the New Philippine Scouts. *See id.* The New Scouts never had more than 30,550 enlisted soldiers, and the outfit was phased out by 1950. OCMH Study at 46–47, J.A. at 73–74.

Philippine World War II veterans thus divide among three groups: the Old Philippine Scouts, the Philippine Army, and the New Philippine Scouts.[5] As mentioned above, the first group has always been considered a United States Army unit, and has always received full veterans benefits. Because of two 1946 acts of Congress, however, the latter two groups have not been accorded equally advantageous treatment.

The First Supplemental Surplus Appropriation Rescission Act of 1946, Pub.L. No.

---

4. Despite the end of hostilities, service in the New Scouts was deemed wartime service, at least for those enlisting in the first year after the Act's passage.

5. A fourth group—the guerrilla fighters—can be considered, for present purposes, as part of the

Philippine Army. The units were led either by U.S. Army or Philippine Army commanders, maintained contact with MacArthur during the occupation, and were formally called into the service of the United States Armed Forces in 1944. *See* OCMH Study at 48–58, J.A. at 75–85.

79–301, 60 Stat. 14, conditioned an appropriation of $200,000,000 to the Philippine Army upon certain limitations on Philippine veterans benefits. As currently codified at 38 U.S.C. § 107(a):

> Service before July 1, 1946, in the organized military forces of the Government of the Commonwealth of the Philippines, while such forces were in the service of the Armed Forces of the United States pursuant to the military order of the President dated July 26, 1941, including among such military forces organized guerrilla forces under commanders appointed, designated, or subsequently recognized by ... competent authority in the Army of the United States, shall not be deemed to have been active military, naval, or air service for the purposes of any law of the United States conferring rights, privileges, or benefits upon any person by reason of the service of such person or the service of any other person in the Armed Forces,

except for purposes of laws conferring certain service-connected benefits not at issue in these appeals.[6] The effects of section 107(a) are, first, to make former members of the Philippine Army and guerrilla forces (and their dependents) ineligible for all non-service-connected United States veterans benefits,[7] and, second, to reduce by 50 percent the service-connected benefits that they may receive.[8]

6. These include (1) National Service Life Insurance benefits under contracts entered before 1946; (2) benefits paid to persons missing in action or prisoners of war, *see* 37 U.S.C. §§ 551–559; and (3) benefits, other than those under the *Social Security Act, relating to service-connected death or disability and burial benefits.

7. Eligibility for veterans benefits depends upon "veteran" status, and 38 U.S.C. § 101(2) defines "veterans" as those who served "in the active military, naval, or air service." Thus, to stipulate that certain service is not "active military, naval, or air service" is to deny benefits for that service.

8. Payments for the three categories of service-connected benefits that veterans of the Philippine Army may receive "shall be made at a rate in pesos as is equivalent to $0.50 for each dollar authorized, and where annual income is a factor in entitlements to benefits, the dollar limitations in the law specifying such annual income shall apply at a rate in Philippine pesos

The Second Supplemental Surplus Appropriation Rescission Act of 1946, Pub.L. No. 79–391, 60 Stat. 223, placed similar limitations upon benefits payable to members of the New Philippine Scouts. As currently codified at 38 U.S.C. § 107(b):

> Service in the [New] Philippine Scouts ... shall not be deemed to have been active military, naval, or air service for the purposes of any of the laws administered by the Veterans Administration, except

as regards (1) benefits under certain National Service Life Insurance contracts, and (2) benefits, other than those under the Social Security Act, relating to service-connected death or disability. Both approved categories of service-connected benefits are, again, reduced by 50 percent. *See supra* note 8.[9]

## II.

The plaintiffs, now appellees, in the cases before us are (1) Felomina Quiban, the surviving spouse of a Philippine Army World War II veteran; (2) Leonila Quizon, a Philippine Army veteran, and (3) Porferio Narisma, a veteran of both the Philippine Army and the New Philippine Scouts. Each plaintiff appears *pro se*.[10] A brief in response to the appellants' brief has been

as is equivalent to $0.50 for each dollar." 38 U.S.C. § 107(a).

9. Plaintiffs may be eligible for some veterans benefits under Philippine law. *See* Brief for the Appellants at 13–14 (listing categories of benefits available under Philippine law). Compared with United States benefits, however, Philippine payments seem meager. The Veterans Federation of the Philippines informed the court, for example, that the old-age pension for veterans, enacted by the Philippine Congress in 1990, is worth about $18 per month. *See* Brief of *Amicus Curiae* at 41–42.

10. On January 24, 1991, we denied a motion by Gilbert Mendoza to file a brief for appellee Quiban. Our order stated: "Mr. Mendoza is not a member of the bar of this court, and has not taken the requisite steps to be admitted *pro hac vice* in this case." We directed the Clerk to return to Mr. Mendoza the papers he sent to the court.

filed by the Veterans Federation of the Philippines, serving as *amicus curiae*.[11]

Each plaintiff challenged section 107's limitations on Philippine veteran eligibility for non-service-connected benefits. The district court sustained the plaintiffs' equal protection challenges to sections 107(a) and (b). *See Quiban,* 713 F.Supp. at 436 (holding section 107(a) unconstitutional); *Quizon,* 713 F.Supp. at 449 (same); *Narisma,* 738 F.Supp. at 548 (holding section 107(b) unconstitutional).

### III.

■ The plaintiffs, through counsel for *amicus,* argued in the district court, and argue again here, that section 107 should be subjected to "strict" equal protection scrutiny. The district court rejected this contention; the Supreme Court's decision in *Harris v. Rosario,* 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (per curiam), the district judge reasoned, required the court to apply the rational basis test.

In *Harris v. Rosario,* the Supreme Court summarily reversed a lower court decision that had used a heightened review standard to invalidate a statutory limitation on Aid to Families with Dependent Children (AFDC) payments to persons residing in Puerto Rico. The Court relied upon Congress's broad powers under the Territory Clause of the Constitution, which authorizes Congress to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States." U.S. CONST., Art. IV, § 3, cl. 2. In exercising this authority, the Court ruled, Congress could "treat [the Commonwealth of] Puerto Rico differently from States so long as there is a rational basis for its actions." 446 U.S. at 651–52, 100 S.Ct. at 1930.

The Supreme Court rested this conclusion upon *Califano v. Torres,* 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (per curiam), which held that Congress could constitutionally deny to persons who became residents of Puerto Rico Supplemental Security Income (SSI) benefits authorized for residents of the states and the District of Columbia. The district court in *Torres,* whose judgment the Supreme Court summarily reversed, had decided the case solely on a "right to travel" analysis. *See id.* at 3 & n. 4, 98 S.Ct. at 907 & n. 4. The Supreme Court's *Torres* opinion, however, suggested in a closing passage that the equal protection claim raised in the *Torres* complaint could not prevail, given the " 'strong presumption of constitutionality' " attending "law[s] providing for governmental payments of monetary benefits." *Id.* at 5, 98 S.Ct. at 908 (quoting *Mathews v. De Castro,* 429 U.S. 181, 185, 97 S.Ct. 431, 434, 50 L.Ed.2d 389 (1976)). Three factors, the Court enumerated in *Torres,* indicated a rational basis for the SSI exclusion of persons in Puerto Rico: (1) Puerto Rican residents do not contribute to the federal treasury, and thus do not help defray the costs of the SSI program; (2) the costs of including Puerto Rico "would be extremely great—an estimated $300 million per year"; (3) inclusion of Puerto Ricans in the SSI program "might seriously disrupt the Puerto Rican economy," presumably because SSI benefits would be high compared to the local cost or standard of living, and might thus create inflationary pressures. *See id.* at 5 n. 7, 98 S.Ct. at 908 n. 7. In *Rosario,* the Court held that the same three considerations formed a rational basis for limiting benefits paid to Puerto Rican residents under the AFDC program. *See* 446 U.S. at 652, 100 S.Ct. at 1930, & n. *.

In determining to apply the rational basis test in the instant case, the district court rejected arguments, advanced by *amicus,* that *Rosario* was distinguishable. The first distinction *amicus* urged was between the indirect payments to individuals in the AFDC program—Congress merely set the standard by which it would reimburse state and territory governments for programs that they administered—and the direct payments to individuals under veterans programs. The district court noted that even

---

**11.** Counsel for *amicus curiae* Veterans Federation of the Philippines had offered to represent appellees without charge, but that offer was not accepted. We regret the absence of counsel for appellees, and appreciate the competent briefing and argument supplied by *amicus curiae.*

Justice Marshall, dissenting in *Rosario,* considered this distinction to be "without 'substance.' " 713 F.Supp. at 442 (quoting *Rosario,* 446 U.S. at 653 n. 1, 100 S.Ct. at 1930 n. 1 (Marshall, J., dissenting)). "[D]iscrimination against the Government of Puerto Rico under the AFDC program," the district court observed, "necessarily operated as discrimination against persons residing in Puerto Rico." 713 F.Supp. at 442.

Second, *amicus* argued that because the AFDC program denied benefits only to Puerto Ricans residing in Puerto Rico, and not to Puerto Ricans residing in the United States, the Supreme Court could have viewed the program as differentiating on the basis of residence, rather than along lines of race or national origin. The Court, *amicus* suggested, may thus have regarded *Rosario* as essentially a "right to travel" case, one not worthy of strict scrutiny because Puerto Ricans were free to move to the United States.[12] By contrast, *amicus* contends, section 107 discriminates on the basis of national origin, and strict scrutiny is thus appropriate.

The district court pointed out, however, that whenever Congress "fail[s] to extend a federal program to Territories," the failure or exclusion could be described as "based on impermissible considerations of race or national origin." 713 F.Supp. at 443. But under *Rosario's* "broad holding," *id.* at 442, the district court recognized, "the Territory Clause permits such exclusion so long as there is a rational basis" for it. *Id.* at 443. While *Rosario* concerned the AFDC program, the Supreme Court's approach, the district court said, must be read to govern "all generally applicable federal programs." *Id.* at 443. In sum, where the Territory Clause holds sway, the

district court concluded, rather than examining whether the exclusion coincides with race or national origin, the court's task is to decide whether the limitation Congress imposed is rationally based. *See id.* at 443.

We note the argument of *amicus* that because Filipino veterans are a "discrete and insular minorit[y]," *see United States v. Carolene Prods. Co.,* 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 783–84 n. 4, 82 L.Ed. 1234 (1938), with no, or diminished, access to channels in which political reform can be pursued, strict scrutiny is required. Brief of *Amicus Curiae* at 25 n. 72. By definition, however, residents of territories lack equal access to channels of political power. To require the government, on that account, to meet the most exacting standard of review—a standard that has been called " 'strict' in theory and fatal in fact," G. GUNTHER, CONSTITUTIONAL LAW 588 (11th ed. 1985)—would be inconsistent with Congress's "[l]arge powers," *Downes v. Bidwell,* 182 U.S. 244, 283, 21 S.Ct. 770, 785, 45 L.Ed. 1088 (1901), to "make all needful Rules and Regulations respecting the Territory ... belonging to the United States." U.S. CONST., Art. IV, § 3, cl. 2. *Cf. Corporation of the Presiding Bishop of the Church of Jesus Christ of the Latter-Day Saints v. Hodel,* 830 F.2d 374 (D.C.Cir. 1987) (rejecting an argument for strict scrutiny of congressional regulation of American Samoa), *cert. denied,* 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988). This point is essentially the one that the district court made when it explained that the Territory Clause permits exclusions or limitations directed at a territory and coinciding with race or national origin, so long as the restriction rests upon a rational base.[13] *Cf. Washington v.*

---

**12.** *Amicus* emphasizes that *Torres,* the only authority cited by the Court in *Rosario,* was decided on "right to travel" grounds. *But cf. supra* pp. 1159–1160.

**13.** *Amicus* argues further that strict scrutiny is warranted, "even apart from race or national origin," because section 107 treats individuals disadvantageously based on an "immutable" condition, a status they cannot change, *i.e.,* their status as World War II veterans of the Philippine armed forces. *See* Brief of *Amicus Curiae*

at 26. But the "immutable characteristic" notion, as it appears in Supreme Court decisions, is tightly-cabined. It does not mean, broadly, something done that cannot be undone. Instead, it is a trait "determined *solely* by accident of birth," *Schweiker v. Wilson,* 450 U.S. 221, 229 n. 11, 101 S.Ct. 1074, 1080 n. 11, 67 L.Ed.2d 186 (1981) (quoting *Frontiero v. Richardson,* 411 U.S. 677, 686, 93 S.Ct. 1764, 1770, 36 L.Ed.2d 583 (1973) (plurality opinion) (emphasis supplied)), one "irrelevant to almost every governmental decision." *Fullilove v. Klutznick,* 448

*Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976) ("Standing alone, [disproportionate racial impact] does not trigger ... strictest scrutiny[.]").

### IV.

█ Although we agree with the district court that strict scrutiny is unwarranted, we part ways with that court on the fate of 38 U.S.C. § 107 when measured against the relatively undemanding rational basis standard. *Rosario,* we hold, not only instructs the court to apply a lenient judicial review standard; it also signals the conclusion that the lines Congress drew regarding Philippine veterans are rationally based, and, therefore, constitutional.

The three factors found dispositive in *Rosario,* and earlier in *Torres, see supra* pp. 1159–1160 are also present here. First, United States taxes have never been imposed in the Philippines; that community, then, although once subject to United States rule, has never contributed to the funding of United States veterans benefits.[14] Second, in contrast to the $240 million estimated annual cost of the benefits at stake in *Rosario* (AFDC and similar Social Security programs), *see* 446 U.S. at 652, 100 S.Ct. at 1930, n. *, the government represented that "the costs of extending full veterans' benefits to veterans of the Philippine Army would approach $2 billion annually, for a substantial period of time." Brief for the Appellants at 22. Third, if inclusion of Puerto Ricans in the SSI program "might seriously disrupt the Puerto Rican economy," *Torres,* 435 U.S. at 5 n. 7, 98 S.Ct. at 908 n. 7, the same could be said of extending the full range of United States veterans benefits to all Philippine veterans of World War II and to their families. This, indeed, was the view of the War Department in 1944, when it opposed proposals to pay soldiers in the Philippine Army wages equal to the pay of their United States counterparts. *See supra* p. 1157. Similar views were expressed in Congress when restrictions on Philippine veterans

benefits were adopted. *See Second Supplemental Surplus Appropriation Rescission Bill, 1946: Hearings on H.R. 5604 Before the Subcomm. of the Senate Comm. on Appropriations,* 79th Cong., 2d Sess. 61 (1946) (hereinafter *1946 Senate Hearings*) (statement of amendment sponsor, Sen. Hayden) ("Whenever any part of the GI bill of rights is extended to Filipino veterans, the cost of living in the Philippines and other economic factors must be given careful consideration.").

In deciding that section 107 was unconstitutional, the district court did not concentrate on the three *Rosario* criteria. Rather, that court seems to have treated *Rosario* as pathmarking only as to the appropriate standard of review, *i.e.,* rational basis rather than heightened scrutiny, and not as to the merits of the plaintiffs' challenge. *See Quiban,* 713 F.Supp. at 442 ("As for the level of scrutiny to be applied to the classification made by § 107, giving *Rosario* a faithful reading the Court must apply the rational basis test. *On this issue, Rosario* and this case cannot be distinguished." (emphasis added)). The district court reasoned that the veterans benefits at issue in the present case are fundamentally different from the social welfare benefits at issue in *Rosario* and *Torres.* While the purpose of the AFDC and SSI programs is "to provide a safety net for persons who are part of the national political, social, and economic markets," the district court wrote, the purpose of veterans programs is "to provide benefits to persons who provided past military service to the United States." *Id.* at 447. However rational it may be to condition social welfare or insurance eligibility upon participation in the social economy that funds the benefit programs, the court concluded, it would not be rational to condition veterans benefits upon participation in the United States economy, rather than simply upon past military service.

---

U.S. 448, 496, 100 S.Ct. 2758, 2784, 65 L.Ed.2d 902 (1980) (Powell, J., concurring).

**14.** We note that all three appellees in this case are residents of the Philippines.

We appreciate the service-based criterion for veterans benefits,[15] but ultimately cannot agree that the benefits at issue here are so sharply distinguishable from other social welfare or insurance benefits as to render *Rosario* and *Torres* uninstructive. Veterans benefits, like other social welfare benefits, including Social Security, are funded by tax revenues. Essentially, they transfer funds from one class—United States taxpayers—to another—persons Congress determines to be worthy, or in need of financial assistance. Absent a classification deemed "suspect" or nearly so, courts have recognized the legislature's broad leeway in this area. *See, e.g., Califano v. Jobst*, 434 U.S. 47, 54–58, 98 S.Ct. 95, 99–102, 54 L.Ed.2d 228 (1977) (disability benefits); *Richardson v. Belcher*, 404 U.S. 78, 82–84, 92 S.Ct. 254, 257–59, 30 L.Ed.2d 231 (1971) (same); *Jefferson v. Hackney*, 406 U.S. 535, 541, 546, 549, 92 S.Ct. 1724, 1729, 1731, 1733, 32 L.Ed.2d 285 (1972) (AFDC); *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (same); *see also Flemming v. Nestor*, 363 U.S. 603, 610–11, 80 S.Ct. 1367, 1372–73, 4 L.Ed.2d 1435 (1960) (upholding as not "patently arbitrary," or "utterly lacking in rational justification," a statute terminating deported person's non-need-based Social Security old-age benefits; Court acknowledged that payments in question were popularly viewed as an "earned right"); *Lagtapon v. Secretary of Health, Educ. & Welfare*, 481 F.2d 538 (D.C.Cir.1973) (upholding as constitutional, because rationally based, exclusion of Philippine soldiers from Social Security coverage credits accorded United States service members).

In sum, we do not find plaintiffs' principal equal protection pleas dispositively different from the ones pressed unsuccessfully in *Rosario*. The distinction Congress drew between members of the Philippine Army and the New Philippine Scouts, on one hand, and United States service members, on the other, therefore survives rational basis review.

## V.

■ Congress drew another line to which the district court ultimately turned. *See Quiban*, 713 F.Supp. at 443–46, 448. The Old Philippine Scouts, as earlier recounted, qualify for all United States veterans benefits, while under 38 U.S.C. § 107, members of the Philippine Army and the New Philippine Scouts do not. *See supra* pp. 1156, 1157–1158.

We cannot agree with the district court that the Old Scouts' unquestioned eligibility for full benefits demonstrates the irrationality of limiting benefits payable to veterans of the Philippine Army and New Philippine Scouts. Based on the distinct origin and history of the Old Philippine Scouts, we conclude, Congress could reasonably treat them differently. *Cf. New Orleans v. Dukes*, 427 U.S. 297, 305, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (upholding grandfather provision challenged as violative of equal protection). The group now identified as the Old Scouts was originally commanded by United States Army officers and paid by the United States War Department. The Old Scouts were incorporated into the United States Army by act of Congress in 1901, *see* OCMH Study at 42, J.A. at 69, and apparently our government used them at the turn of the century to quell the Philippine rebellion against American rule. *See* Brief of *Amicus Curiae* at 5–7. The Philippine Army, by contrast, was created by legislation of the Philippine Commonwealth government, after Congress had set a timetable for Philippine independence. The New Philippine Scouts were established

---

15. It appears, however, that the most substantial benefits plaintiffs seek are pensions, not payable simply on the basis of past military service. Qualification for non-service-connected pensions further depends, as did the AFDC payments at stake in *Rosario*, on a showing of present financial need. *See* 38 U.S.C. §§ 502–503, 521–523 (regarding non-service-connected disability pensions); *id.* §§ 541–543 (regarding pensions for surviving spouses and children); *see also* § 610(a)(1)(I) (providing for hospital care benefits for non-service-connected disability, subject to means test of 38 U.S.C. § 622(a)(1)). Need, in other words, is a condition of eligibility for these benefits, not a factor used only "to adjust the level of benefits." *But see Quiban*, 713 F.Supp. at 448 n. 38.

just before Philippine independence, with a view not only toward occupation of the Far East, but also toward the force's role as part of the new Philippine Army. *See 1946 Senate Hearings, supra,* at 61 (statement of amendment sponsor, Sen. Hayden). Congress could thus reasonably consider the Old Philippine Scouts to be more integrally a part of the United States armed forces than either the Philippine Army or the New Philippine Scouts, and accordingly bracket the Old Scouts with United States veterans for benefits purposes.

Moreover, if the relevant comparison is between the Old Philippine Scouts, on one hand, and the Philippine Army and New Philippine Scouts, on the other, then even if we were persuaded that section 107 was unconstitutional, serious questions would arise as to the proper remedy. The district court thought it proper to extend benefits to the 230,000–330,000 Philippine Army and New Philippine Scouts veterans, rather than to nullify the qualification of the Old Scouts, who seem to have numbered less than 12,000, for benefits Congress denied to the far larger group. The Supreme Court, however, has indicated that in choosing between extension and nullification, the reviewing court should defer to the choice that the legislature would likely have made, had it considered the issue itself. *See Califano v. Westcott,* 443 U.S. 76, 90, 99 S.Ct. 2655, 2663, 61 L.Ed.2d 382 (1979); *id.* at 94, 99 S.Ct. at 2665 (Powell, J., dissenting); *see also Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 1807, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring in the result). In light of section 107's clear purpose to limit the costs of Philippine Army and New Philippine Scouts veterans benefits, it would be difficult to conclude that Congress would have preferred to include the large group rather than to exclude the Old Philippine Scouts from the benefits at stake in this case.

## VI.

This case is controlled by *Harris v. Rosario,* both as to the standard of review and as to the merits of the constitutional challenge. Under the lenient *Rosario* stan-

dard, we must conclude that section 107—while hardly generous to veterans of the Philippine Army and the New Philippine Scouts—is constitutional. Accordingly, the district court's judgment is

*Reversed.*