970 F.2d 626
 Francisco A. GUERRERO, Petitioner-Appellant,
v.
Michael P.W. STONE, Secretary of the Army, and Edward
Derwinski, Secretary of the Department of
Veterans' Affairs, in their official
capacities, Respondents-Appellees.
 No. 91-16454.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 11, 1992.
Decided July 16, 1992.
 
 John D. Hickman, San Francisco, Cal., for petitioner-appellant.
 Robert M. Butler, Sp. Asst. U.S. Atty., San Francisco, Cal., for respondent-appellee.
 Appeal from the United States District Court for the Northern District of California.
 Before: BROWNING, ALDISERT* and PREGERSON, Circuit Judges.
 ALDISERT, Circuit Judge:
 
 
 1
 In Guerrero v. Marsh, 819 F.2d 238 (9th Cir.1987), we granted a writ of mandamus commanding the Army Board for Correction of Military Records ("the Board") to take jurisdiction over an application by Francisco A. Guerrero for a change in his military records to show that he was properly inducted into the United States Army during the Japanese occupation of the Philippines in the early days of World War II and that he subsequently received an honorable discharge. Following our remand, the Board considered the application and rejected it on the grounds that it was not submitted within three years after the discovery of the alleged error or within ten years after the effective date of the 1951 amendments to the statute. 10 U.S.C. § 1552(b).[1] The Board is authorized to waive the time limit "in the interest of justice," id., but the Board did not find this to be an appropriate case for waiver.
 
 
 2
 Guerrero sought and was denied relief in the district court and now appeals to us.[2] His appeal requires us first to decide the extent of review, if any, by a federal court over determinations of the Board. We hold that the district court had jurisdiction essentially for the reasons set forth in Neal v. Secretary of Navy, 639 F.2d 1029, 1036-37 (3d Cir.1981), and Jaffee v. United States, 592 F.2d 712, 718-19 (3d Cir.), cert. denied, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979), and that the Board action therefore may be set aside if arbitrary, capricious or an unlawful exercise of discretion. 5 U.S.C. §§ 702, 706(2)(A).
 
 
 3
 We will then meet the merits of the appellant's contentions under this standard. We hold that the Army's interpretation of the order under which Guerrero enlisted and the extraordinary history of official vacillation by the Army covering a period of 50 years constitute agency action that is arbitrary, capricious and an abuse of discretion. Accordingly, we reverse the district court judgment and order the Secretary of the Army to correct Guerrero's records to indicate that he was properly inducted into the United States Army, was subsequently granted an honorable discharge and now has status as a United States Army veteran.
 
 I.
 
 4
 Controlling the question of subject matter jurisdiction here is the Administrative Procedure Act (APA), which provides in relevant part:
 
 
 5
 A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted ... in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States....
 
 
 6
 5 U.S.C. § 702 (1976). This provision waives sovereign immunity for equitable actions brought pursuant to 28 U.S.C. § 1331. See e.g., Beller v. Middendorf, 632 F.2d 788, 796-97 (9th Cir.1980), cert. denied, 452 U.S. 905, 101 S.Ct. 3030, 69 L.Ed.2d 405 (1981).
 
 
 7
 The various boards for correction of military records derive their authority from 10 U.S.C. § 1552(a)(1):
 
 
 8
 The Secretary of a military department may correct any military record of the Secretary's department when the Secretary considers it necessary to correct an error or remove an injustice. Except as provided in paragraph (2) [not relevant here], such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that military department.
 
 
 9
 We conclude that the Army Board for Correction of Military Records is an "agency" within the meaning of the APA, inasmuch as "agency" is defined to include "each authority of the Government." 5 U.S.C. § 701(b)(1). The only exceptions applicable to the military are those for "military authority exercised in the field in time of war or in occupied territory," id. § 701(b)(1)(G), and "courts martial and military commissions," id. § 701(b)(1)(F), neither of which applies here.
 
 
 10
 The Supreme Court has stated, "Board [for Correction of Military Records] decisions are subject to judicial review and can be set aside if they are arbitrary, capricious, or not based on substantial evidence." Chappell v. Wallace, 462 U.S. 296, 303, 103 S.Ct. 2362, 2367, 76 L.Ed.2d 586 (1983). Moreover, as stated in Secretary of Navy v. Huff, 444 U.S. 453, 458 n. 5, 100 S.Ct. 606, 609 n. 5, 62 L.Ed.2d 607 (1980), "the federal courts are open to assure that, in applying [military] regulations, commanders do not abuse the discretion necessarily vested in them." See also Sanders v. United States, 594 F.2d 804, 811, 219 Ct.Cl. 285 (1979) ("Once a plaintiff has sought relief from the Correction Board, such plaintiff is bound by that board's determination unless he can meet the difficult standard of proof that the Correction Board's decision was illegal because it was arbitrary, or capricious...."). We are persuaded by the reasoning in Neal v. Secretary of Navy, 639 F.2d at 1037 (applying this standard in review of decisions of Enlisted Performance Board and Board for Correction of Naval Records); see also Ballenger v. Marsh, 708 F.2d 349, 350 (8th Cir.1983) ("Board decisions denying 'corrective' action are reviewable by federal courts") (citing cases).
 
 
 11
 The federal courts have subject matter jurisdiction, and we turn to the district court's conclusion that the Board determination passed muster under the arbitrary and capricious standard.[3]II.
 
 
 12
 We present a brief summary of the case before entering the labyrinth itself. Guerrero is a United States citizen now living in the San Francisco Bay area. He was born in the Philippines in 1919 and lived there during and after World War II. When the Japanese invaded his homeland in 1942, he enlisted with the 14th Infantry Regiment, United States Army. He engaged in guerrilla actions against the Japanese throughout the war and assisted United State troops in re-taking the islands in 1945. After his honorable discharge in 1947, the Army invalidated his enlistment and revoked his veteran status. This status was then restored in 1951, repudiated again in 1953, recognized again in 1977 and denied for the third time in 1978.
 
 
 13
 The Army Board for Correction of Military Records twice refused to consider Guerrero's request for a correction of his records to reflect his Army service status.
 
 
 14
 We observe at the outset that even before this court the Army is ambivalent about Guerrero's status. Notwithstanding extensive efforts before administrative and judicial tribunals to prevent recognition of his veteran status, the Army makes the following unequivocal assertion on page one of its brief: "On July 27, 1942, appellant, at the time a Philippine national, was inducted into the United States Army." Brief for Appellee at 1. No attempt is made to square this statement with the proposition that Guerrero is not a veteran of the United States Army.
 
 
 15
 This latter proposition is premised on the Army's current interpretation of an order transmitted by radio on July 12, 1942, by General Douglas MacArthur, then commander-in-chief of the allied forces in the southwest Pacific, including the forces in the Philippines. Prior to that date, the 14th Infantry Regiment was a unit of the Philippine Army. The July 12 order appointed the officers of the 14th Infantry to the United States Army and authorized them to induct their men into the United States Army.
 
 
 16
 The 14th Infantry was thus designated a unit of the United States Army, effective July 14, 1942. Guerrero was inducted into the regiment on July 27, 1942. The Army now asserts that because he was not physically present when the 14th Infantry became a United States military unit on July 14, he is not entitled to United States Army status. Even though he was sworn into service in a Philippine jungle, a short time after the fall of Bataan and Corregidor, when United States armed forces were on the defensive throughout the Pacific and were desperately short of fighting men, he was 13 days too late to receive the chrism of United States Army status.
 
 
 17
 Our task, then, is to review the facts in this case, largely undisputed, to determine whether the Board was arbitrary and capricious in refusing to exercise its statutory authority to waive the applicable limitations period "in the interest of justice." 10 U.S.C. § 1552(b). We then must determine whether the two-weeks-too-late interpretation of General MacArthur's radio order, coupled with the Army's in-again-out-again-Finnegan treatment of Guerrero's status, is arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence.
 
 
 18
 Guerrero has exhausted his administrative remedies, and jurisdiction was proper in the trial court based on the APA, as discussed above, and on 28 U.S.C. § 1651 (All Writs Act) and 28 U.S.C. §§ 2201 and 2202 (declaratory judgments). We have jurisdiction under 28 U.S.C. § 1291. The appeal was timely filed under Rule 4(a) of the Federal Rules of Appellate Procedure.
 
 III.
 
 19
 Before the United States entered World War II, Francisco A. Guerrero worked in the United States Army officers' mess at Camp John Hay in Baguio City, Philippines. He then served as a locomotive operator until the Japanese attacked Pearl Harbor on December 7, 1941, following which he returned to his Army job in the officers' mess. A short time later, the command pulled out of camp in the face of the advancing Japanese army.
 
 
 20
 In February 1942, Guerrero enlisted in the Philippine Scouts, now referred to as the Old Philippine Scouts to distinguish it from another unit (the New Philippine Scouts) formed after the war. See Quiban v. Veterans Admin., 928 F.2d 1154, 1157 (D.C.Cir.1991). Men who served in the old Philippine Scouts are considered veterans of the United States Armed Forces. Id. at 1156. While in the Philippine Scouts, Guerrero engaged in hazardous guerilla activity against the enemy.
 
 
 21
 Meanwhile, the 14th Infantry, then a unit of the Philippine Army, also was fighting the Japanese. But everywhere the Allies were in retreat, their ships sunk, their planes destroyed, their troops killed or captured. General MacArthur withdrew from the Philippines on March 12, 1942, and set up his headquarters in Australia with extensive new responsibilities. From there he contacted the commander of the 14th Infantry:
 
 
 22
 On 12 July 1942, by radio message, General MacArthur offered the Regimental Commander, 14th Infantry Regiment (Philippine Army), Army of the United States status in recognition of the regiment's outstanding service. The message authorized the induction of the Philippine Army troops into the Army of the United States and blocks of serial numbers were provided for both the officers and enlisted men. Information about the induction was immediately circulated to the officers and enlisted men in the regimental command post and vicinity and two officers were sent to induct the officers and enlisted men of Headquarters Battalion and 1st Battalion. The Battalion Commander, 2d Battalion, was designated to induct members of the 2d Battalion.
 
 
 23
 Board Memorandum of Consideration at 6; E.R. at 24.
 
 
 24
 On July 15, 1942, the regimental commander accepted United States Army status for the 14th Infantry, effective July 14, and the men of the Headquarters Battalion and the 1st Battalion were inducted. The soldiers of the 2d Battalion evidently were inducted later, on July 23. Board Memorandum at 6-7; E.R. at 24-25. Guerrero was inducted into the 2d Battalion as a staff sergeant on July 27 and was assigned Army Serial No. 10626378, ostensibly one of the serial numbers authorized in the radio message.
 
 
 25
 The regimental commander was captured on September 29, but the 2d Battalion continued to defy the Japanese. Guerrero's battalion thereafter was referred to as the 14th Infantry Regiment, United States Army Forces in the Philippines, Northern Luzon.
 
 
 26
 In November 1942, while participating in guerrilla operations in enemy-held territory, Guerrero was arrested by Japanese military police and tortured. He refused to reveal any information regarding the whereabouts of American officers with whom he served. After a month, he was released. He was arrested again in March 1943 and again released, apparently still able to maintain his cover. When not in Japanese custody, he carried out guerrilla actions against enemy forces and gathered information about Japanese troop movements. The United States Sixth Army invaded in January 1945, and Guerrero served with them. In May 1945, he led an American tank battalion into Baguio City and engaged in hand-to-hand combat with the enemy.
 
 
 27
 After the war, Guerrero served at regimental headquarters and was granted an honorable discharge from the United States Army on March 20, 1947. The discharge noted that he had received the Asiatic-Pacific theater ribbon with one bronze star; the Philippines Defense Ribbon with one bronze star; the World War II victory medal; and the Philippine Independence Ribbon. Guerrero's service is described in his affidavit and in affidavits from at least four men who served in the Philippines and knew him personally. Guerrero v. Marsh, 819 F.2d at 240.
 
 
 28
 The Board's Memorandum of Consideration describes "Evidence of Record" in Guerrero's Army file that is largely consistent with this account. The Board Memorandum indicates that Guerrero enlisted as a staff sergeant in Headquarters Company, 2d Battalion, 14th Infantry Regiment, United States Army, on July 27, 1942; that he served with the 14th Infantry and with the 12th Infantry Regiment, United States Army; and that on March 20, 1947, he "was honorably discharged from the Army of the United States in the grade of staff sergeant with 3 years, 10 months and 25 days of creditable service," Army serial number 10626378. Board Memorandum at 2-3; E.R. at 20-21.
 
 
 29
 After the war, the Army sought to identify all members of the 14th Infantry Regiment. It thereafter became evident that more individuals were claiming this distinction than deserved it.
 
 
 30
 In 1949, as a result of the Veterans Administration's need for additional information on individuals applying for Veterans Administration benefits, a thorough review was made of all records.... As a result of this review, many individuals who had previously been determined to be members of the 14th Infantry Regiment (Army of the United States), were found not to have been eligible for induction, or to have been in a prisoner of war status, or engaged in civilian occupations and physically could not have been inducted as they had alleged....
 
 
 31
 In view of the circumstances enumerated above, the Department of the Army revised the criteria for determining eligibility for Army of the United States status. In part, it was established ... that only Philippine Army members present with the command on 14 July 1942, who were officially inducted into the Army of the United States, acquired such status; that personnel who joined the 14th Infantry Regiment on 15 July 1942 could not, regardless of prior service, qualify for Army of the United States status; and that those persons so joining the 14th Infantry on or after 15 July 1942, who had their names on the roster of the 14th Infantry, United States Army Forces in the Philippines, Northern Luzon, could thereby acquire recognized guerrilla status, but were not entitled to Army of the United States status.
 
 
 32
 Board Memorandum at 7-8; E.R. at 25-26.
 
 
 33
 It bears emphasis that this decision was made in 1949, long after the war had been won, and for reasons far removed from the desperate needs of July 1942, when the United States was seeking to recruit as many fighting men as possible. It was not until 1949 that the Army decided that General MacArthur's order applied only to the men serving with the unit on one single day and not those who joined even a day later.
 
 
 34
 On January 17, 1950, a memorandum from Headquarters, Adjutant General Records Depository, Philippine Command (Air Force) and Thirteenth Air Force, sent to the Records Administration Center (Demobilized Personnel Records Branch), stated that Guerrero had no United States Army status. Id. at 3; E.R. at 20. Presumably this memorandum was related to the 1949 determination. It is not clear, however, what jurisdiction or authority an Air Force command had over an Army veteran who did not serve in any unit associated with the old Army Air Corps. It also is not clear that Guerrero ever received notice of this decision. Nevertheless, in February 1950, Guerrero's name was deleted from the roster of the 14th Infantry.
 
 
 35
 But things were soon to change. Within the next year, the Adjutant General came on the scene to resurrect Guerrero's official United States Army status:
 
 
 36
 In response to [the January 17 memorandum,] the Adjutant General in Washington on April 20, 1951 directed a review of Guerrero's status in conformity with "the criteria for determining eligibility for 14th Infantry, AUS, status." In response to this directive, the Adjutant General, Special Correspondence Section, [Demobilized Personnel Records Branch], undertook a review of Guerrero's record in accordance with these criteria. The review noted that a number of inductions were made into the army by American officers in the field, not always complying with every legal technicality; that official documents showing the induction did not always exist; and that affidavits might be the best support that could be furnished for proof of induction into the 14th Infantry. After a thorough consideration of Guerrero's file, the review memorandum concluded that the United States Army status of Guerrero had been "formally recognized by an authorized headquarters on October 8, 1946 operating under an approved policy in effect at that time." The bottom line of the review was that Guerrero should be advised that he was recognized as having status in the United States Army "as a result of his service with the 14th Infantry regiment," and that the Veterans Administration and the Finance Office of the Army should be notified to the same effect. This memorandum carries the notation "Approved: recommended action will be taken." The memorandum is signed by the Adjutant General acting by authority of the Secretary of the Army.
 
 
 37
 Guerrero v. Marsh, 819 F.2d at 240 (copy of memorandum, dated July 6, 1951, reproduced in E.R. at 32-35). See also Board Memorandum at 4; E.R. at 22.
 
 
 38
 But the bureaucratic yo-yo continued to spin. The Board described the next turn of events as follows:
 
 
 39
 [O]n 10 November 1953 [Guerrero] was advised that an exhaustive study had been conducted by the Department of the Army of the history and organization of the 14th Infantry Regiment (Army of the United States) while under the overall command of Lieutenant Colonels Warner and Nakar. It had been determined that the applicant did not meet the basic requirement established for Army of the United States status in the 14th Infantry Regiment, and that his status had been revoked and all interested agencies had been so notified. The applicant appealed the revocation of his Army of the United States status and was advised that a review of the records had confirmed the correctness of the determination....
 
 
 40
 Board Memorandum at 4; E.R. at 22.
 
 
 41
 This court did not agree precisely with this version of the facts. In Guerrero v. Marsh we noted that Guerrero's file contains a form dated November 10, 1953, stating perfunctorily that his status "has been revoked." 819 F.2d at 241. We observed, "It is indeed possible and perhaps probable that the revocation referred to is the revocation of January 17, 1950 which was specifically disapproved by the memorandum of July 6, 1951." Id. We did not indicate that Guerrero appealed this determination.
 
 
 42
 A summary of the saga thus far is appropriate here:
 
 
 43
 . Guerrero is inducted into the 14th Regiment on July 27, 1942.
 
 
 44
 . He is honorably discharged on March 20, 1947.
 
 
 45
 . His Army status is revoked on January 17, 1950.
 
 
 46
 . His Army status is restored on April 20, 1951.
 
 
 47
 . His Army status is revoked again on November 10, 1953.
 
 
 48
 We now come to June 27, 1977. On this date, as we reported in Guerrero v. Marsh, Guerrero received a "Certification of Military Service" from the National Personnel Records Center, General Services Administration, certifying his status as a veteran of the United States Army. 819 F.2d at 241. At oral argument, Guerrero's counsel indicated that Guerrero obtained this certification in the course of his application for United States citizenship. Counsel stated that the five-year residency period was waived because of Guerrero's status as a veteran of the United States Army. Tape of Oral Argument (June 11, 1992).
 
 
 49
 The Board, however, did not mention this document. Instead, the Board reported that Guerrero received a letter dated November 21, 1977, from the Adjutant General indicating that he had served with the Philippine Commonwealth Army and with the recognized guerrillas. Board Memorandum at 4; E.R. at 22. But it cannot be denied that in June 1977, the General Services Administration issued the certification attesting to Guerrero's status as an Army veteran. We have examined this document. The Board's failure to record this significant action is relevant to the question whether the Board's final decision was arbitrary and capricious.
 
 
 50
 This second resurrection of Guerrero's Army service status, however, was short-lived. On March 15, 1978, he was again notified that he had no status as a veteran. Id.; Guerrero v. Marsh, 819 F.2d at 241. This notification referred to the 1953 study and reiterated the view that because Guerrero was not physically present with the Headquarters Battalion or the 1st Battalion when these troops were inducted on July 14, 1942, and because his name did not appear on the official 14th Infantry roster of that date, he had not become a member.
 
 
 51
 The first phase of the saga thus came to a close, and the litigation phase began.
 
 IV.
 
 52
 Guerrero apparently did not request a review of the 1978 decision, but he did ask the staff of a United States Senator to intervene for him. Board Memorandum at 5; E.R. at 23. Some inquiries were made, but Guerrero obtained no relief. On March 15, 1983, Guerrero submitted to the Board his first application for correction of his records. On March 16, the Board responded that it did not consider applications of members of the Philippine Army. On June 6, 1985, Guerrero filed a mandamus petition in the United States District Court, seeking an order directing the Board to consider his application. The district court denied the petition because Guerrero had not complied with 10 U.S.C. § 1552(b), which provides that military records may not be corrected unless the request for correction is made within three years after discovery of the error. However, the statute authorizes the Board to "excuse a failure to file within three years after discovery if it finds it to be in the interest of justice." Id.
 
 
 53
 We reversed and held that the Board had failed " 'to exercise its express statutory jurisdiction.' " Guerrero v. Marsh, 819 F.2d at 241 (quoting Baxter v. Claytor, 652 F.2d 181, 186 (D.C.Cir.1981) (when Board erroneously told applicant that Board had no authority to correct his records, and Board did not expressly find that his application was barred by laches or by statute of limitations, Board "erred in failing to perform a nondiscretionary duty ... to consider [applicant's] request for relief")). We noted that the Board's standard practice was to consider applications for correction on a case-by-case basis and remanded to give the Board an opportunity to decide in the first instance whether the three-year limit should be waived in the interest of justice. Id. at 241, 242.
 
 V.
 
 54
 After a lengthy report of the evidence, the Board denied the application in two short paragraphs:
 
 
 55
 DISCUSSION: The alleged error or injustice was, or with reasonable diligence should have been discovered on or about 10 November 1953 when [Guerrero] was advised following his appeal to the Department that the previous action establishing his status in the Army of the United States was erroneous. The time for the applicant to file a request for correction of any error or injustice expired on 26 October 1961.[4]
 
 
 56
 DETERMINATION: The subject application was not submitted within the time required. The applicant has not presented and the records do not contain sufficient justification to conclude that it would be in the interest of justice to grant the relief requested or to excuse the failure to file within the time prescribed by law.
 
 
 57
 Board Memorandum at 9; E.R. at 27.
 
 
 58
 Following this determination, Guerrero filed a second petition for writ of mandamus and declaratory relief, asking the district court to order the Secretary of the Army to issue a certificate of military service or, in the alternative, to order the Secretary of the Department of Veterans Affairs "to perform his legal duty to accord the petitioner benefits administered by the Department of Veterans Affairs." E.R. at 6.
 
 
 59
 On November 16, 1990, the district court denied the federal appellees' motion for summary judgment. E.R. at 39-44. Noting that the Board's decision should be overturned only if it was arbitrary, capricious or unsupported by substantial evidence, Burns v. Marsh, 820 F.2d 1108, 1110 (9th Cir.1987), the court concluded:
 
 
 60
 In this case, this court is not prepared to find a clear abuse of discretion sufficient to overturn the Board's finding. At the same time, this court sees much in petitioner's case that should have commended it to the Board. As discussed above, petitioner served the United States honorably during a harrowing campaign. He was tortured by the enemy. He was decorated for his services, and today is a United States citizen. Viewed in isolation, this case appears to be one in which the interests of justice should have agitated strongly in petitioner's favor.
 
 
 61
 E.R. at 42. The court stated that it was considering an order requesting the Secretary to "contemplate making an exception to the July 14, 1942 cut off date in consideration of petitioner's excellent record of faithful service to the United States." Id. The court explained:
 
 
 62
 If respondents find that this case is not unique, and that the Board's finding that relief would not be in the interests of justice is consistent with its rulings in cases with similar facts, then this court would be less inclined to remand the case to the Secretary of the Army and request him to reconsider it in light of petitioner's military record.
 
 
 63
 Id. at 43. The court then issued a show cause order requiring the Army to demonstrate that the determination of Guerrero's status was consistent with prior decisions in similar cases.
 
 
 64
 In response to the show cause order, the Army filed a memorandum with appendices suggesting that Guerrero's case was quite routine. E.R. at 45-70. The Army noted that it had granted veteran status only to 122 of the approximately 3,500 persons who had claimed to be members of the 14th Infantry Regiment. Id. at 49 (roster reproduced in E.R. at 68-70). The Army also included copies of the Memoranda of Consideration in two other cases. The first involved a request of correction by an applicant who had been inducted on July 28, 1942, had two months and 17 days of creditable service, and had been honorably discharged on January 15, 1949. Id. at 53. His veteran status was revoked on November 16, 1953, following the Army's study of the 14th Infantry, and his request for a correction of records was denied. The other involved a United States Marine who was captured on Corregidor in 1942, subsequently escaped from a POW camp, joined the guerilla forces and purportedly received a field promotion while serving with the guerillas. Id. at 57. His request for a correction of his records to reflect the field promotion was denied.
 
 
 65
 Finally, the Army noted that more than 500 actions had been filed in the District Court for the District of Columbia by Filipino veterans and their families seeking benefits based on military service. Id. at 49 (citing Quizon v. United States Veterans Admin., 713 F.Supp. 449 (D.D.C.1989), reversed, 928 F.2d 1154 (D.C.Cir.1991); Quiban v. United States Veterans Admin., 713 F.Supp. 436 (D.D.C.1989), reversed, 928 F.2d 1154 (D.C.Cir.1991)).
 
 
 66
 The district court agreed with the Army that the facts of Guerrero's case "are far from unique." Id. at 85. The court noted, "Although the facts of [Guerrero's] case are compelling ... the exigencies of war time can require the setting of seemingly arbitrary cut off dates." Id. The court concluded that the Board had not acted arbitrarily and capriciously and dismissed the petition. Guerrero appealed.
 
 VI.
 
 67
 Our first task is to review the district court's determination that the Board did not act arbitrarily or capriciously with respect to the waiver. As stated before, the court agreed that Guerrero's circumstances were not unique, being persuaded that the comparison cases offered by the Army demonstrated that Guerrero was treated like similarly situated individuals. This conclusion constitutes reversible error.
 
 
 68
 The district court, in its November 16, 1990, show cause order, directed the Army to compare Guerrero's case to cases with like facts. Id. at 43. The Army offered two examples purporting to demonstrate that the treatment of Guerrero's application was consistent with the treatment of similar cases. The first example involved an individual with two months and 17 days service. This individual does not have a record even approaching Guerrero's history of long and dutiful service, nor was he subjected to the official indecision that Guerrero has endured. The other example was a United States Marine seeking credit for a field promotion. This soldier was unaffected by the Army's post-war interpretation of General MacArthur's July 12 order, which was the deciding factor for Guerrero.
 
 
 69
 Likewise, the more-than-500 actions to which the Army referred have not been shown to be analogous to Guerrero's application. The reported cases involve the denial of benefits to World War II veterans of the Philippine Army and to former members of the New Philippine Scouts, a unit of the Philippine Commonwealth Army created after the war. Quiban v. Veterans Admin., 928 F.2d 1154, 1158 (D.C.Cir.1991). Unlike these claimants, Guerrero bases his request on his membership in the United States Army. These cases thus have no bearing on the merits of his request.
 
 
 70
 None of the cases cited by the Army is comparable to Guerrero's case, in which a soldier was inducted into the United States Army in 1942, served faithfully and was honorably discharged in 1947, then had his veteran status revoked by an Air Force command in 1950, recognized by the General Services Administration in 1977 and then revoked again in 1978. The Army has failed to demonstrate that Guerrero was treated like similarly situated individuals. Instead, the Army argues that many people properly have been denied United States Army status, and therefore it is proper to deny this status to Guerrero. The conclusion obviously does not follow from the premise.
 
 
 71
 Examining the uncontroverted evidence--a compelling account indeed of a soldier who responded in this country's darkest hour and served it faithfully to the final victory--and considering the extraordinary history of inconsistent decisions in this case, we conclude that it is in the interest of justice to waive the three-year limitations as set out in the statute. The Board's decision to the contrary was arbitrary, capricious and unsupported by substantial evidence. Accordingly, we reverse the judgment of the district court.
 
 VII.
 
 72
 Deciding the limitations waiver question, however, does not end the matter. Under ordinary circumstances, we could remand with a direction that the Board meet the merits of Guerrero's request for corrections. But we are not presented here with ordinary circumstances.
 
 
 73
 Before us is a case of official policy at war with itself, one in which Guerrero has been caught in the cross-fire for more than four decades. The inconsistent decision-making in this case cannot be reconciled by any reasonable measuring standard. This dismal history of administrative pendulation, of decision-making completely devoid of permanence and consistency, turns its face against a fundamental purpose of judicial and quasi-judicial decision-making: to provide "individuals reasonable guidance toward conducting themselves in accordance with the demands of the social order."[5] Unusual cases call for unusual remedies. And this is a very unusual case. We therefore will consider the merits of Guerrero's application for a correction of his military records.
 
 
 74
 In doing so, we rely on ample precedent. Ordinarily, we will not substitute our judgment for that of an agency, but in an appropriate case, we may order the substantive relief sought, even if doing so supplants the decision of the agency. See, e.g., White v. Secretary of Army, 878 F.2d 501, 506 (D.C.Cir.1989) (court of appeals ordered upgrade of discharge from "undesirable" to "honorable or general, using the standards applicable to those discharged at the expiration of the normal term of their service"); VanderMolen v. Stetson, 571 F.2d 617, 625, 626-27 (D.C.Cir.1977) (court of appeals ordered reinstatement of Air Force officer denied promotion and discharged for expressing moral reservations about use of nuclear weapons to cause massive civilian casualties, where Air Force did not accord procedural protections set out in Air Force regulations); Yee v. United States, 512 F.2d 1383, 1388, 206 Ct.Cl. 388 (1975) (on review of correction board's denial of relief to discharged Air Force officer, court of claims ordered reinstatement, back pay and specified corrections in officer's service record).
 
 A.
 
 75
 The sole basis for denying Guerrero's Army service status was the Army's interpretation of General MacArthur's July 12, 1942, radio order concerning the 14th Infantry Regiment. We note that an administrative interpretation of a military order is judicially reviewable. See United States v. Roberts, 779 F.2d 565, 568 (9th Cir.), cert. denied, 479 U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986) (judicial review of drug seizure on high seas by Navy ship to determine whether action was authorized by Secretary's instruction regarding use of Navy equipment to monitor sea traffic); United States v. Hoffman, 488 F.2d 923, 928 (5th Cir.1974) (judicial review of Selective Service's interpretation of presidential directive regarding order of selection for draft); Pfister v. United States, 203 Ct.Cl. 459, ---- (1974) (judicial review of Air Force interpretation of plaintiff's retirement order to determine whether plaintiff was retired at grade of major or lieutenant colonel).
 
 B.
 
 76
 The Army argues that General MacArthur's order conferred military status only on those present with the unit and inducted on July 14, 1942. Only the Headquarters Battalion and the 1st Battalion were inducted on that day, so this interpretation apparently precludes Army status for all members of the 2d Battalion. Guerrero was inducted 13 days later, on the 27th. The Army's position on Guerrero's application for correction was clearly stated in the following colloquy at oral argument:
 
 
 77
 THE COURT: So, it comes down to, then, that the United States takes the position that had he been there on the 14th, we wouldn't be in this courtroom today.
 
 
 78
 COUNSEL: That is correct.
 
 
 79
 THE COURT: The fact that it occurred 13 days later makes all the difference in the outcome of this case.
 
 
 80
 COUNSEL: It has made all the difference in 1950, in 1953, and again in 1978.
 
 
 81
 THE COURT: Is that carrying out MacArthur's intent?
 
 
 82
 COUNSEL: I'd like to be able to ask him that question, your honor. I really would.
 
 
 83
 Tape of Oral Argument (June 11, 1991). We now consider this question.
 
 1.
 
 84
 On March 12, 1942, General MacArthur left Corregidor in the Philippines in a PT boat for his journey to Australia to assume a new position as commander-in-chief of Allied forces in the southwest Pacific theater.[6] General Jonathan Wainwright, the field commander in the Philippines, issued his surrender order on May 6.[7] The Battle of the Coral Sea took place during May 6-8, during which the carrier Lexington was sunk and the Yorktown was seriously damaged.[8] A month later at Midway, the United States Navy repulsed the Japanese fleet, sinking four carriers but also losing the Yorktown.[9] Although Midway was an important victory, it left the Navy with only two carriers, the Enterprise and the Hornet, to cover the entire Pacific Ocean. Allied infantry strength had been severely reduced by the advancing Japanese forces.
 
 
 85
 Recognizing the desperate need for soldiers, the War Department issued Circular No. 220 on July 7, 1942: "The appointment or enlistment in the Army of the United States of those officers and enlisted men of the Philippine Army who are serving with the United States armed forces is authorized." On July 12, General MacArthur broadcasted his order to the commander of the 14th Infantry: "[A]ll officers, Philippine Army, your force, appointed officers Army of the United States in Philippine Army grades held on date of acceptance. You may enlist all Philippine Army soldiers, your force, in Army of the United States in grades now held in Philippine Army." Board Memorandum at 8; E.R. at 26.
 
 
 86
 Acting under the authority of this order, the regimental commander accepted Army of the United States status for the unit on July 15, retroactive to July 14. The men of the Headquarters Battalion and the 1st Battalion were inducted, effective July 14. As the Board reported, "The Battalion Commander, 2d Battalion, was designated to induct the members of the 2d Battalion," which he did, apparently on July 23. Id. at 6-7; E.R. at 23-24. Guerrero was inducted on July 27.
 
 
 87
 Nowhere in this order is there any date restriction or any other conditions. Nor does the manner in which the order was carried out support such a conclusion. The officers did not attempt to assemble the entire regiment or to take a roll call of soldiers then present. Rather, they proceeded to carry out the radio order according to its terms.
 
 2.
 
 88
 Nevertheless, the Army reinterpreted the order in 1949 and now urges this new reading on us. At oral argument, counsel for the Army stated that General MacArthur's intent was to "tak[e] a picture" of the unit at that time. Tape of Oral Argument (June 11, 1992). The rationale for this interpretation is frankly set out in the Board's Memorandum of Decision: The reconsideration of the order was undertaken "as a result of the Veterans Administration's need for additional information on individuals applying for Veterans Administration benefits." Board Memorandum at 7; E.R. at 25.
 
 
 89
 The decision thus had nothing to do with "the exigencies of war time" as suggested by the district court. Rather, the priorities were purely fiscal. The VA believed that too many Filipinos were requesting veterans benefits. Instead of deciding each case on the merits, the Army decided to draw a bright line. Such arbitrary administrative distinctions, however, cannot stand when they contradict the declared policy they purport to follow.
 
 
 90
 Given the unique, if not bizarre, history of administrative decisions granting and repudiating Army service status to Guerrero, we hold that at least as to Francisco A. Guerrero, the above interpretation of General MacArthur's radio order is arbitrary, capricious and not based on substantial evidence.
 
 C.
 
 91
 We reach this conclusion for several discrete reasons. First, on April 20, 1951, the Adjutant General of the Army rejected the very interpretation now urged on us. The memorandum accompanying the Adjutant General's restoration of Guerrero's status presents the facts of Guerrero's service and then applies them directly to the question of his status. E.R. at 32-35. This careful evaluation contrasts with the cursory formulas recited in the documents denying Guerrero's status. The Army does not explain why these latter determinations are more reliable, or what flaws in the Adjutant General's decision in 1951 requires that it be rejected. Nor did the Board acknowledge that the Adjutant General questioned the propriety of reconsidering Guerrero's status as had been done in 1949:
 
 
 92
 Another appropriate point for discussion in this case revolves around the question as to whether or not a determination made in the past by a headquarters duly authorized to make such determinations shall be subject to an arbitrary review and possible reversal by the same or by a succeeding headquarters. It has always been understood to be the Department of the Army policy to reopen and redetermine past administrative actions only where such actions have been found to have been originally made in error, or to have resulted from an act of fraud or misrepresentation on the part of the individual concerned.
 
 
 93
 E.R. at 33.
 
 
 94
 Similarly, the Board refused to confront the fact that Guerrero's status was again recognized in connection with his application for United States citizenship. The National Personnel Records Center of the General Services Administration was satisfied that Guerrero had served. It issued an official certification to that effect. Yet the Board did not so much as mention this document, much less reconcile it with the position that Guerrero's status was officially revoked. The Board, like any administrative decision-maker, may find the evidence on one side of a question more convincing, but it may not simply ignore the evidence on the other side.
 
 
 95
 Second, an interpretation of an order or regulation must be based on its language and the intent behind it. 2 Kenneth C. Davis, Administrative Law Treatise § 7.13 (2d ed. 1979). As the Court said in Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944), one of the foundation cases in this area:
 
 
 96
 The weight of such [an interpretation] in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.
 
 
 97
 To interpret a wartime command order to facilitate a post-war rejection of Veterans Administration claims runs counter to these fundamental principles. Even if the Army takes the position that its interpretation gives effect to General MacArthur's intent, this position is indefensible. As we have explained, it strains credulity to conclude that General MacArthur intended to limit induction into the United States Army only to those present on July 14, 1942. The reality is that MacArthur needed every available person to fight the enemy in the Philippines. He brought the 14th Infantry into the United States Army to be a fighting force that would conduct long-term guerrilla actions against the Japanese. He did not issue an excursion ticket that was good for one day only. Such an interpretation does not square with the language or the context of the order, nor does it make sense 50 years later.
 
 
 98
 Moreover, if we accept the Army's contention that the order authorizes the induction only of those soldiers who were serving on the day the regimental commander accepted United States Army status for his unit, we must doubt the status of the entire 2d Battalion. They were not present when the Headquarters Battalion and the 1st Battalion were inducted. Yet when the regimental commander was captured several months later, the 2d Battalion effectively became the entire regiment. Now the Army offers a rule that calls into question the status of every member of the unit. Such a result borders on the absurd.
 
 
 99
 The third reason, which is at the heart of this matter, concerns the statutory mandate of the Army Board for Correction of Military Records. The Board is charged with correcting errors and removing injustices in applicants' service records. 10 U.S.C. § 1552(a)(1). To remove injustices is the Board's chief responsibility and constitutes its very reason for being. The Army has no need of a Board that stubbornly hews to obscure decisions or slavishly follows bright-line distinctions simply because doing so relieves some agency of the difficult task of considering each case on the merits. The Army needs a Board that serves the interest of justice. In the case of Francisco A. Guerrero, the Board has refused to follow its mandate.
 
 VIII.
 
 100
 Accordingly, we reverse the judgment of the district court and remand these proceedings with a direction that the district court issue a writ of mandamus directing the Secretary of the Army to correct the records of Francisco A. Guerrero to show that he was inducted into the Army of the United States on July 27, 1942, that he was honorably discharged on March 20, 1947, and that he now has status as a veteran of the United States Army.
 
 
 101
 Guerrero has prevailed under the Equal Access to Justice Act, 28 U.S.C. § 2412, and may apply to this court for attorney's fees.
 
 
 102
 REVERSED and REMANDED.
 
 
 
 *
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 [1]
 The ten-year deadline appeared in the version of the statute that was in effect when Guerrero filed his first application with the Board. Act of October 25, 1951, Pub.L. No. 82-220, § 1, 65 Stat. 655, reprinted in 1951 U.S.C.C.A.N. 669, 670. The statute was amended in 1988 and currently requires filing within three years of discovery. National Defense Authorization Act, Fiscal Year 1989, Pub.L. No. 100-456, § 1233(a)(1), 102 Stat.1918, 2057 (1988) (current version at 10 U.S.C. § 1552(b))
 
 
 [2]
 We are faced here with several administrative decision-makers that are not entirely distinct. The Board denied Guerrero's application for correction of his records. Guerrero petitioned the district court for a writ of mandamus directing the Secretary of the Army and the Secretary of Veterans Affairs to take corrective actions. Upon denial of the petition, Guerrero named both respondents as appellees, but only the Secretary of the Army filed a brief. We will refer to the appellees as "the Army" and refer separately to "the Board" as the decision-maker that denied Guerrero's request for corrections
 
 
 [3]
 Because we decide that relief should be granted under the Administrative Procedure Act, it is not necessary for us to meet Guerrero's contention that the Board's action constituted a denial of protection assured him under the Due Process Clause. "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." Lyng v. Northwest Indian Cemetery Protective Ass'n, 485 U.S. 439, 445, 108 S.Ct. 1319, 1323, 99 L.Ed.2d 534 (1988)
 
 
 [4]
 This deadline appeared in the version of the statute that was in effect when Guerrero filed his first application with the Board. See supra n. 1
 
 
 [5]
 Roscoe Pound, Hierarchy of Sources and Forms in Different Systems of Law, 7 Tul.L.Rev. 475, 476 (1933)
 
 
 [6]
 United States Army in World War II--The War in the Pacific: Louis Morton, The Fall of the Philippines 365 (1953)
 
 
 [7]
 Id. at 571-72
 
 
 [8]
 William W. Smith, Midway: Turning Point in the Pacific 42, 47-48 (1966)
 
 
 [9]
 See generally id. at 96-156